IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
2019 FEB 28 PM 5:07

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

TAIWO OKUSAMI, M.D.,

    *Plaintiff,*

    v.

MARYLAND DEPARTMENT OF
HEALTH AND MENTAL HYGIENE,

    *Defendant.*

Civil Action No. ELH-18-1701

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Taiwo Okusami, M.D., an African-American psychiatrist, has sued his former employer, the Maryland Department of Health and Mental Hygiene, Thomas B. Finan Center (the "Department" or "DHMH").[1] ECF 1 (the "Complaint"). He asserts three claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"): discrimination on the basis of race (Count I); harassment and hostile work environment (Count II); and retaliation (Count III). ECF 1, ¶¶ 21-37.[2] In addition, in Count IV, he asserts a claim for wrongful discharge under Maryland law. *Id.* ¶¶ 38-41. Plaintiff seeks attorney's fees, costs, and monetary relief, including back pay and front pay. *See id.*

---

[1] Effective July 2017, the Maryland Department of Health and Mental Hygiene became the Maryland Department of Health. *See* Md. Code (2015 Repl. Vol., 2018 Supp.), §§ 1–101, 2–101 of the Health–General Article. It is a principal department of the State government.

[2] The Complaint does not expressly assert a claim under the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2014 Repl. Vol., 2018 Supp.), § 20–606 of the State Government Article ("S.G."). MFEPA "is the state analogue of Title VII." *Alexander v. Marriott Int'l, Inc.*, RWT-09-2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011).

The Complaint erroneously numbers two paragraphs as ¶ 38 and two paragraphs as ¶ 39. *See* ECF 1 at 17-18.

The Department has moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), for lack of subject matter jurisdiction under the Eleventh Amendment, and for failure to state a claim. The motion is supported by a memorandum of law (ECF 9-1) (collectively, the "Motion") and two exhibits. ECF 9-2 - ECF 9-3.[3] In particular, the Department contends that dismissal of Count IV is warranted, because the Eleventh Amendment bars plaintiff's wrongful termination claim in federal court. ECF 9-1 at 6-8. In addition, it asserts that the remaining claims (Counts I, II, and III) fail to state a claim. *Id.* at 8-17. Alternatively, the Department argues that the parties executed a "Personal Services Contract" (ECF 9-2, the "Contract"), by which the "parties agreed that Maryland's State courts, and not federal court, have exclusive jurisdiction to hear Dr. Okusami's claims arising related [sic] to his employment with the State of Maryland." *Id.* at 17.

Plaintiff has filed an opposition to the Motion (ECF 12), supported by a memorandum of law (ECF 12-1) (the "Opposition") and several exhibits. ECF 12-3 - ECF 12-6. Defendant has replied. ECF 13 (the "Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion (ECF 9) as to Counts II, III, and IV. But, I shall deny the Motion as to Count I.

## I.      Factual Background[4]

The Department "is a state agency that regulates health care providers, facilities, and organizations, and manages direct services to patients where appropriate. ECF 1, ¶ 2. It "has four major divisions – Public Health Services, Behavioral Health, Developmental Disabilities, and

---

[3] The Department filed the Motion only pursuant to Rule 12(b)(6). However, as discussed below, I shall consider defendant's Eleventh Amendment challenge under Rule 12(b)(1).

[4] Given the posture of the case, and as discussed, *infra*, I must assume the truth of the factual allegations.

Health Care Financing." *Id.* Also, the Department "has 20 boards that license and regulate health care professionals[,] various commissions that issue grants, and research and make recommendations on issues that affect Maryland's health care delivery system." *Id.*

The Thomas B. Finan Center (the "Center") is "a multi-purpose psychiatric facility operating 88 beds" and "a primary inpatient component" of the Department. *Id.* The Center admits patients pursuant to a commitment order after a finding in criminal court that the defendant is either not competent to stand trial or is found not criminally responsible for the crimes committed. *See* Md. Code (2015 Repl. Vol., 2018 Supp.), §§ 10–701 *et seq.* of the Health–General Article ("H.G.").

Maryland law tasks the Center with preparing "a written plan of treatment" for individuals at the Center, commonly referred to as an Individual Treatment Plan ("ITP"). H.G. § 10–706(a)(1). The ITP "is a comprehensive and thoughtfully written plan based on an initial diagnostic impression and an overall evaluation of the patient's specific needs and problems." Code of Maryland Regulations ("COMAR") 10.21.03.03A (defining the content and nature of ITPs). Of relevance here, the ITP is "developed by members of the mental health professional treatment team who are directly involved in the patient's care." COMAR 10.21.03.03B.

Dr. Okusami has extensive experience in the field of psychiatry, and is licensed in both Maryland and Virginia. ECF 1, ¶ 1. At the relevant time, he held certifications in General Psychiatry and Child/Adolescent Psychiatry from the American Board of Psychiatry and Neurology. *Id.*

From April 2011 through November 1, 2016, plaintiff was employed by the Department as a Staff Psychiatrist at the Center. *Id.*; ECF 10-4 ("Department Statement Position") at 6. As a "Staff Psychiatrist," plaintiff's duties included "evaluating and treating patients with various

mental illnesses." *Id.* "His contract was reviewed for renewal on an annual basis." ECF 10-4 at 6.

On or about July 1, 2016, the parties entered into a Personal Services Contract with the Department, for the period of July 1, 2016, through June 30, 2017. ECF 1, ¶ 1; ECF 9-2. Although plaintiff was "a contractual employee," pursuant to Md. Code (2015 Repl. Vol., 2018 Supp.) §§ 13–101 *et seq.* of the State Personnel and Pensions Article ("S.P.P."), the Contract "establishe[d] an employer-employee relationship" between the Center and Dr. Okusami. ECF 9-2 at 1. The Contract provided, among other things, that Dr. Okusami "was to be paid $120.00 per hour" based on "a regular workweek consisting of 40 hours." ECF 1, ¶ 9; ECF 9-2 at 1. The total amount of compensation for the term "was not to exceed $249,600.00." *Id.*

At the Center, "Dr. Okusami was responsible for the operations of a facility," called Cottage 1. *Id.* ¶ 8. The facility "provided short-term housing for its residents with twenty-two beds and [was] staffed with a nursing assistant, psychologists, and [a] social worker, all of whom reported to Dr. Okusami." *Id.* His duties "included, in part, performing mental health evaluations of mentally ill patients accused of crimes to make a determination of their mental state and fitness to attend trial." *Id.*

Until July 8, 2016, Dr. Okusami was supervised by Dr. David Millis, who was then the Medical Director of the Center. ECF 1, ¶ 9. Dr. Millis resigned as of July 8, 2016. *Id.* Thereafter, from July 9, 2016, until November 1, 2016, John Cullen, the Chief Executive Officer of the Center, served as plaintiff's supervisor. *Id.*

Dr. Okusami claims that in 2015 he "began to be harassed" by Dr. Millis and Cullen, both of whom are Caucasian. *Id.* ¶ 10. "Specifically, in March 2015, Dr. Okusami was subpoenaed to testify at trial regarding his findings from examining a patient." *Id.* However, he "was not

compensated" for the time he spent at the trial, even though two of his Caucasian coworkers, Mary Lou Perkins and Janet Hendershot, were compensated for such time. *Id.*[5]

Perkins, an LCSW and forensic coordinator, and Hendershot, the Forensic Psychology Chief, "were both permanent, state government employees." *Id.* However, similar to plaintiff, they "interacted with and treated patients" at the Center "for competency and criminal responsibility evaluations"; they were members of the Center's "forensic evaluation team"; and they testified "on behalf of the patients that [sic] were under their care and treatment." *Id.* Over the course of Dr. Okusami's employment at the Center, he "testified on more than ten (10) separate occasions on behalf of various patients regarding the methods, findings, and conclusions in forensic reports prepared by [] Hendershot." *Id.*

On several occasions between March and August 2015, Cullen and Dr. Millis purportedly "ordered Dr. Okusami to stop performing and documenting his examinations with thoroughness and candor because his medical opinions tended to frequently conflict with the medical opinions of the forensic evaluators." *Id.* ¶ 11. In plaintiff's words, "Cullen and Dr. Millis expressed a preference to prescribe patients medication which Dr. Okusami only viewed as an option of medical necessity if the circumstances warranted prescription medications given the . . . propensity for addiction to psychotropic drugs." *Id.*

Dr. Okusami sent correspondence to Cullen and Dr. Millis on August 12, 2015, stating *id.* ¶ 12 (alterations in original):

> Dear Gentlemen:
>
> I have been called to 2 meetings with you regarding my role as a psychiatrist. At both meetings, the last was on 8/11/15, you again informed me that DHMH's policy has restriction on my role as a psychiatrist: specifically that I cannot evaluate a

---

[5] Plaintiff states that Hendershot is a medical doctor. ECF 1, ¶ 10. However, the defense disputes that Hendershot is a physician. ECF 9-1 at 11.

patient's cognitive state in regards to the alleged crime they are charged with AND I cannot document my professional opinion with regards to my findings. At both meetings you threatened to terminate my employment if I did not comply.

As I understand the duties of a Physician/Psychiatrist as licensed by the Board of Medicine, as regulated by the AMA and the APA, there is no restriction to a Psychiatrist's duty to evaluate a patient and that evaluation includes taking all elements of stressors (and legal issues are stressors) that may affect the patient's mental wellbeing or illness.

I am also required by law to keep an accurate record of my treatment recommendations for each patient I evaluate.

Please provide me the DHMH policy that limits my function as a Psychiatrist so I understand the rational [sic].

These issues arose because in the course of my evaluating patients I have documented my opinions which apparently did not conform to the conclusion of the Forensic evaluators.

As I under [sic] the responsibility of Forensic evaluation, the evaluator reviews all available medical records on the patient, interviews the patient and then write [sic] an opinion on whatever question the Court was asking. The evaluator's responsibility is to make a coherent, factual report. The evaluator is not bound by any opinion I, as an Attending, may have written about the patient being evaluated.

I do not believe that I because I am a State employee requires me to give up medical responsibilities under the law; to do so will be a violation of the Hippocratic oath: to do no harm. To withhold a reasoned psychiatric opinion on a patient I have duly evaluated will be a violation of that oath.

The law requires that I have a patient-doctor relationship with any patient under my care, irrespective of how the patients are referred, and that includes a duty to offer the patient my treatment recommendation and is not limited to prescribing medication. It also includes psychotherapy during which I can offer the patient my opinion on how the mental illness may or may not be impairing the ability to understand the legal stressors he/she maybe facing and address the ability to understand all the necessary components involve [sic] in resolution of the stressor.

Now, what you are requiring of me, if confirmed by DHMH's policy, is essentially interfering with my duty as a Psychiatrist, which will also be a violation of the duties enumerated in the Medical Bylaws.

The argument that because I have been subpoenaed by the Defense Attorney and that my testimony which will be contrary to the Forensic opinion of DHMH's appointed evaluator will make the Hospital look foolish I do not find [to have]

6

merit. The Hospital does not employ professionals with monolithic views. On the contrary it will show that the Hospital [is] independent and not an arm of the Justice Dept. The role of mental health professionals is to provide an opinion to help the Courts understand the role of mental illness, if any, in the deliberations Judges have to make.

The threat to any professional who may have a dissenting opinion is not warranted, especially in a Mental Health Agency.

In conclusion, please provide the DHMH policy you have cited as authority for restricting my practice of Psychiatry.

Thank you,
Sincerely
[signature appears in original]
Taiwo Okusami, M.D.

On October 2, 2015, Dr. Okusami was again subpoenaed to testify at a patient's competency hearing. ECF 1, ¶ 13. Soon after, he submitted a request to Dr. Millis "to be compensated for his . . . professional time spent testifying at the competency hearing." *Id.* Dr. Okusami was allegedly "told not to attend the hearing, but that if he chose to go he would have to 'go on his own time.'" *Id.* Dr. Okusami decided to attend the hearing, because he believed that he "would be subject to legal and financial consequences of not appearing pursuant to the subpoena[.]" *Id.* To plaintiff's knowledge, Perkins and Hendershot "continued to receive compensation for their appearance to testify in response to issued subpoenas." *Id.*

From March 2016 until November 2016, Dr. Millis repeatedly told plaintiff that Cullen "was aware of staff complaints" regarding Dr. Okusami. ECF 1, ¶ 14. However, despite Dr. Okusami's requests, Dr. Millis "would never present any formal complaints" to plaintiff. *Id.*

During that time, Cullen allegedly "instructed a social worker" to disregard Dr. Okusami's request to set up aftercare services for a patient. And, with respect to another patient under Dr. Okusami's care, Cullen "instructed the nursing staff to disregard Plaintiff's instructions for the use of physical and chemical restraints . . . ." *Id.* In addition, with regard to "a release hearing," Cullen

replaced plaintiff with Dr. Millis, who "previously had only marginal contact with the patient." *Id.* The Complaint alleges: "None of Plaintiff Okusami's similarly situated Caucasian peers, including Dr. Hendershot, were ever subjected to such treatment at the hands of Mr. Cullen." *Id.*

Also, until the time of Dr. Okusami's termination, Cullen instructed Dr. Okusami "not to use the word 'competent' in the medical records of patients which [sic] Plaintiff was treating." *Id.* Plaintiff alleges that none of his "similarly situated Caucasian peers, including Dr. Hendershot, were subject to such baseless criticism of their subjective medical notations." *Id.*

In October 2016, one of Dr. Okusami's patients "filed a petition to be released to another facility which offered less aggressive treatment and therapy . . . ." *Id.* ¶ 15. Plaintiff claims that he "supported the patient's request because the patient had not exhibited any signs or symptoms of any mental illness." *Id.* Further, Dr. Okusami "had documented that the patient had already been at the Hospital for at least five months" when the patient "began to indicate an absence of any signs or symptoms of mental illness[.]" *Id.* In addition, "the patient had been maintained on the same medication dosage during his tenure at the facility." *Id.*

However, the Department "and its staff . . . were not supportive of the patient's request." *Id.* ¶ 16. Two weeks prior to a hearing regarding the patient's request, Hendershot and Perkins approached plaintiff and "were persistent that Dr. Okusami refute the patient's request to be released." ECF 1, ¶ 16. They allegedly told plaintiff that "'the patient has not been in the hospital long enough.'" *Id.* Dr. Okusami "responded that a recommendation regarding patient care should be based on a patient's mental state and not on how long the patient stayed in the facility, especially since the patient in this instance was exercising the rights afforded to him under state law." *Id.*

On October 4, 2016, Dr. Okusami attended a meeting with members of the "forensic medical evaluation treatment team," including Cullen, Dr. Millis, Dr. Thomas Grieger, Dr. Sherry

Passarell, and Dr. Joel Hassman. *Id.* ¶ 17. During the meeting, Cullen "scolded" plaintiff "in front of those in attendance, stating that the Plaintiff's 'opposition to the Hospital's position ma[de] the Hospital look bad[.]'" *Id.* Further, Cullen told Dr. Okusami that he was "'tired of [Dr. Okusami] testifying for patients when [his] opinion is different from the Hospital's position.'" *Id.* (alterations in original). Cullen then "threatened [plaintiff's] employment, telling him 'Your position is jeopardized because you keep going against the hospital's position.'" *Id.*

According to the Complaint, Dr. Oksami responded that he "was fulfilling his obligation under Maryland law by testifying on behalf of patients whom he treated, including the patient whose release was the subject of the . . . meeting." *Id.* ¶ 18. Further, Dr. Oksami stated that, "as the patient's psychiatrist, he would not deny the patient the benefit of his testimony" because he believed "it was in the best interest of the health and safety of the patient" and based on "a patient-doctor relationship." *Id.* Cullen then "responded by reiterating his verbal threats to Plaintiff's continued employment." *Id.*

The patient's hearing was held on October 7, 2016, before an Administrative Law Judge ("ALJ"). *Id.* ¶ 19. Cullen was present, "despite not having been present at prior hearings" where "Okusami provided medical testimony on behalf of patients." *Id.* At the request of the patient's lawyer, the ALJ "asked all those testifying to vacate the room." ECF 1, ¶ 19. However, Cullen remained after he told the ALJ: "'As CEO, I am here to observe.'" *Id.* Then, throughout the hearing, Cullen "continuously glared at Dr. Okusami in a threatening and intimidating manner." *Id.*

After the hearing, Dr. Okusami "went on a previously planned vacation for one week." *Id.* ¶ 20. Upon plaintiff's return on October 17, 2016, "he was summoned to Mr. Cullen's office for [a] one-on-one meeting . . . ." *Id.* At the outset of the meeting, "Cullen demanded that Plaintiff

'resign based on [his] at will clause'" in the Contract. *Id.* (alteration in original). In response, "Dr. Okusami told Mr. Cullen that he had no intention of resigning" and maintained that "he had done nothing wrong." *Id.* Further, Dr. Okusami maintained that "all he has done is perform his legal duties imposed on him by Maryland law as a treating physician." *Id.*

Cullen responded "that he did not have to give Plaintiff a reason for terminating Plaintiff's employment because he was at-will." *Id.* Cullen then provided plaintiff a letter, dated October 17, 2016, which stated, ECF 1, ¶ 20:

Dear Dr. Okusami:

Pursuant to our Special Payments contract with you, the Center may terminate your contract without cause.

I have decided to terminate your contract effective November 1, 2016.

Please take the next two weeks to finish all of your charting and transitioning your patients to Dr. Passarell.

I would like to thank you for your 5 plus years here at the Center.

> Sincerely,
> [signature appears in the original]
> John G. Cullen
> CEO

Dr. Okusami was then "excused from Mr. Cullen's office and spent the following two weeks transitioning his patients per Mr. Cullen's directive." *Id.* At the time, "Dr. Okusami was 69 years old," and he claims that his termination "caused [him] substantial stress, depression, and anxiety." *Id.*

On December 30, 2016, Dr. Okusami filed his Charge of Discrimination (the "Charge") with the United States Equal Opportunity Commission (the "EEOC"). *Id.* ¶ 4. He received a Notice of Right to Sue letter from the EEOC, dated May 1, 2018. *Id.* This suit followed on June 11, 2018.

## II. Legal Standard

### A. Rule 12(b)(1)

The Department has moved to dismiss plaintiff's wrongful discharge claim (Count IV), pursuant to Fed. R. Civ. P. 12(b)(6), for lack of subject matter jurisdiction. It asserts that the claim is barred by sovereign immunity, pursuant to the Eleventh Amendment.

Sovereign immunity is a jurisdictional bar. As the Fourth Circuit has said, "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)).

A motion to dismiss based on the Eleventh Amendment is sometimes considered under Rule 12(b)(1), rather than Rule 12(b)(6). *See Abril v. Comm'w of Va.*, 145 F.3d 182, 184 (4th Cir. 1998) (affirming the district court's dismissal of a claim barred by sovereign immunity under Rule 12(b)(1)); *Strong v. Swaim-Stanley*, WMN-12-cv-1924, 2012 WL 4058054 (D. Md. Sept. 13, 2012). Judge Roger Titus of this Court explained in *Beckham v. National R.R. Passenger Corporation*, 569 F. Supp. 2d 542, 547 (D. Md. 2008) (internal citations omitted, alteration added):

> [T]he Eleventh Amendment limits the ability of a federal district court to exercise its subject-matter jurisdiction over an action brought against a state or one of its entities. As such, although Eleventh Amendment immunity is not a "true limit" on this Court's subject matter jurisdiction, the Court concludes that it is more appropriate to consider this argument under Fed. R. Civ. P. 12(b)(1) because it ultimately challenges this Court's ability to exercise its Article III power.

> Therefore, I shall consider the Eleventh Amendment challenge under Rule 12(b)(1).

The plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Pres. Ass'n v. The Cty. Comm'rs Of Carroll Cty.*, 523 F.3d 453, 459

(4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). But, the defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted) (alteration in original); *see Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't Of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009) ("Unless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute,' the district court may ... resolve the jurisdictional facts in dispute by considering evidence ... such as affidavits.") (citation omitted); *Evans*, 166 F.3d at 647.

With respect to the contention that Dr. Okusami's wrongful termination claim is barred by Eleventh Amendment immunity, defendant seems to raise a facial challenge. Therefore, I shall assume the truth of Dr. Okusami's allegations.

## B.    Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom., McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . .") (citation omitted); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. ____, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a

complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Cmm'w of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quotation marks and citation omitted). The purpose of the rule is to ensure that defendants are "given adequate notice of the nature of a claim" made against them. *Twombly*, 550 U.S. at 555-56. But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative

defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

### C. Exhibits

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d

449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take

judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Dr. Okusami did not attach any exhibits to his Complaint. The Department appended to the Motion Dr. Okusami's Personal Services Contract of July 1, 2016. ECF 9-2. And, plaintiff submitted four exhibits with his Opposition: the Charge of Discrimination, filed with the EEOC on December 30, 2016 (ECF 12-3); plaintiff's Statement of Facts, submitted with the Charge (ECF 12-4); the Department's Position Statement, filed on July 20, 2017, in response to the Charge (ECF 12-5); and the complaint filed by plaintiff in a related State action, *Okusami, M.D. v. Cullen, et al.*, Case No. C-01-CV-18-000425 (Allegany Co. Cir. Ct. Sept. 4, 2018) (ECF 12-6).

The Contract is integral to the Complaint because it is referenced repeatedly, and because it appears to be the basis of the Complaint. I may also consider the Charge, Dr. Okusami's Statement of Facts, and the Department's Position Statement, because these documents give rise to a plaintiff's legal right to file a civil suit for employment discrimination and are necessarily relied on to satisfy statutory requirements. *See, e.g., Williams v. 1199 SEIU United Healthcare Workers E.*, WMN-12-00072, 2012 WL 2923164, at *1 n.1 (D. Md. July 17, 2012) ("In the employment discrimination context, a court may consider an EEOC charge and other EEOC documentation because such documents are integral to the complaint as plaintiff necessarily relies on these documents to satisfy the time limit requirements of the statutory scheme.") (citing *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 565-66 (2d Cir.2006); *Edwards v. Murphy–Brown, L.L.C.*, 760 F.Supp.2d 607, 617 n.3 (E.D. Va. 2011)).

In particular, before filing suit in federal court under Title VII, a potential plaintiff must first file a charge with the EEOC. 42 U.S.C. § 2000e-5(f)(1) (2006) (permitting civil suit by the "person claiming to be aggrieved" after filing of a charge with the EEOC and upon receipt of a right-to-sue letter); *see also, e.g., Parker v. Reema Consulting Servs., Inc.*, ___ F.3d ___, 2019 WL 490652, at *6 (4th Cir. Feb. 8, 2019); *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Puryear v. Cty. of Roanoke*, 214 F.3d 514, 518 (4th Cir. 2000). This is known as the "exhaustion requirement," and it "ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles*, 429 F.3d at 491.

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)). "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012).

Title VII's exhaustion requirement functions as a jurisdictional bar in federal court; a suit is subject to dismissal if a plaintiff has failed to comply with it. In *Balas*, 711 F.3d at 406, the Court said: "[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies."

Even when a plaintiff has filed a claim with the EEOC, a court cannot consider matters that were not properly raised during the EEOC process. *See, e.g., Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963

(4th Cir. 1996)) ("'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'"); *Miles*, 429 F.3d at 491. To determine whether a plaintiff has "properly alleged [a claim] before the EEOC" in a manner satisfying the exhaustion requirement, courts "may look only to the charge filed with that agency." *Balas*, 711 F.3d at 408; *see also Evans*, 80 F.3d at 962-63 ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint."); *Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation."). In addition, a court may consider "'charges that would naturally have arisen from an investigation thereof.'" *Parker*, 2019 WL 490652, at *6 (citation omitted).

For these reasons, the Charge (ECF 12-3), the Statement of Facts (ECF 12-4), and the Position Statement (ECF 12-5) are integral to the Complaint.

As noted, plaintiff also submitted a copy of the complaint he filed in a separate but related State action in the Circuit Court for Allegany County. ECF 12-6. It was filed on September 4, 2018—almost three months after plaintiff initiated the instant action. The complaint asserts six State law claims against the Center, the Department, and Cullen: "Discrimination on the Basis of Race," in violation of Md. Code (2014 Repl. Vol., 2018 Supp.), § 20–606(a)(1)(i) of the State Government Article ("S.G.") (Count I); "Discrimination on the Basis of National Origin," in violation of S.G. § 20–606(a)(1)(i) (Count II); "Compensatory Discrimination on the Basis of Race," in violation of S.G. § 20–606(a)(1)(i) (Count III); "Employer Retaliation," in violation of S.G. § 20–606(a)(f)(1) (Count IV); "Breach of Contract" (Count V); and "Gross Negligence" (Count VI). Although the relevance of the exhibit is not entirely clear, I may take judicial notice

of the filing of the complaint and its content, as a matter of public record. *See Goldfarb*, 791 F.3d at 508.

## III.    Discussion

### A.    Eleventh Amendment Immunity

The Department argues that the Eleventh Amendment to the Constitution warrants dismissal of plaintiff's wrongful termination claim in Count IV. ECF 9-1 at 6. As noted, the claim is predicated on State law.

It is undisputed that plaintiff was an at-will employee of the State. In Maryland, an employer may terminate an at-will employee at any time, for almost any reason or for no reason. *See, e.g., Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 303, 596 A.2d 1069, 1073 (1999); *Samuels v. Tschechtelin*, 135 Md. App. 483, 525, 763 A.2d 209, 232 (2000). But, there is an important limitation: an at-will employee may not be discharged in violation of a clear mandate of public policy. *Adler v. Am. Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464, 471-73 (1981); *see, e.g., Molesowrth v. Brandon*, 341 Md. 621, 672 A.2d 608 (1996).

Although plaintiff was an at-will employee, he may assert a claim of wrongful discharge in a Maryland court based on an allegation of race discrimination, as race discrimination violates a clear mandate of public policy. But, the claim asserted here was lodged in federal court.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." Thus, states, state agencies, and state officials sued in their official capacities generally enjoy immunity from suits brought in federal court by their own citizens. *See Hans v. La.*, 134 U.S. 1, 3 (1890); *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of

20

the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). However, the "Eleventh Amendment does not shield state actors from liability for constitutional torts that they commit in their individual capacities." *Dyer v. Md. State Bd. of Educ.*, 187 F. Supp. 3d 599, 611 (D. Md. 2016), *aff'd*, 685 F. App'x 261 (4th Cir. 2017).

The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities . . . ." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002); *see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf &Eddy, Inc.*, 506 U.S. 139, 146 (1993) (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)). Thus, the Eleventh Amendment, which preserves the sovereign immunity of the states, precludes a private individual from suing an unconsenting state for monetary damages in federal court, absent waiver or a valid Congressional abrogation of sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 56-58 (1996).

And, of import here, Eleventh Amendment sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," absent waiver or a valid congressional abrogation of sovereign immunity. In *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984), the Supreme Court said: "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *See also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v.*

*Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

The Department is a "principal department" of the Maryland "State government." H.G. § 2-101. Thus, the Department is an arm of the State. And, the Center is one of six facilities "maintained under the direction" of the Department. H.G. § 10-406.

There are, however, three exceptions to the Eleventh Amendment's prohibition of a suit in federal court against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court explained, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001) . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437 (2004) . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 618 (2002).

The first exception is not applicable here. Sovereign immunity in federal court extends to claims premised upon a state's alleged violation of state law. *See Bragg v. W. Va. Coal Ass'n,* 248 F.3d 275, 293 (4th Cir. 2001) (quoting *Pennhurst,* 465 U.S. at 106) (observing that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). Congress has not abrogated the State's immunity.

The second exception involves the doctrine of *Ex parte Young,* 209 U.S. 123, 159-60 (1908). *Ex parte Young* provides an exception to the general law in cases brought against state officials in their official capacities, permitting prospective injunctive relief to correct an ongoing violation. *Id.* To determine if the exception applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief

properly characterized as prospective." *Manion v. N.C. Med. Bd.*, 693 F. App'x 178, 180-81 (4th Cir. 2017) (citation omitted). In this case, plaintiff does not seek prospective relief.

As to the third exception, there is no allegation of a waiver of immunity by the State. To be sure, a state may waive its Eleventh Amendment sovereign immunity and permit suit in federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a State has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996). Under *Atascadero*, a court may find that a state has waived its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." *Id.* (internal quotation marks and alteration omitted); *accord Lee-Thomas*, 666 F.3d at 250-51.

In his Opposition, Dr. Okusami asserts that, under S.G. §§ 12–101 *et seq.*, the State has waived the defense of sovereign immunity. Specifically, § 12–201(a) provides (emphasis added):

> Except as otherwise expressly provided by a law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity, in a *contract* action, in a *court of the State*, based on a written *contract* that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee.

*See also, e.g., Dep't of Pub. Safety and Corr. Sers. v. ARA Health Servs., Inc.*, 107 Md. App. 445, 668 A.2d 960 (1995), *aff'd*, 344 Md. 85, 685 A.2d 435 (1996) (per curiam).

However, § 12–201(a) is inapplicable here. This suit is not a breach of contract action. Nor was this action filed in State court.

With respect to tort actions, S.G. § 12–104(a)(1) provides a limited waiver of State sovereign immunity. It states, in relevant part, that "the immunity of the State or of its units is

waived as to a tort action, in a *court of the State*[.]" (Emphasis added). But, this section is also inapplicable because it applies only to actions in State court. *Id.*

Under the circumstances here, Maryland has not waived its sovereign immunity as to suit in *federal* court. *See McCray*, 741 F.3d at 483; *see also Constantine*, 411 F.3d at 479; *Zimmer-Rubert v. Bd. of Educ. of Balt. City*, 179 Md. App. 589, 597-98, 947 A.2d 135, 140-41 (2008), *aff'd*, 409 Md. 200 (2009) (examining *Lewis v. Bd. of Educ. of Talbot Cty.*, 262 F. Supp. 2d 608, 610-14 (D. Md. May 7, 2003), which concluded that a State agency was entitled to sovereign immunity pursuant to the Eleventh Amendment with respect to a wrongful discharge claim).

Accordingly, the Eleventh Amendment bars plaintiff's wrongful termination claim in Count IV.

### B.    Title VII

Relying on Title VII, plaintiff asserts claims against the Department for race discrimination (Count I); harassment and hostile work environment (Count II); and retaliation (Count III).

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1344 (2015); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

#### 1.    Methods of Proof

In general, *at trial*, a plaintiff "may establish a discrimination claim under Title VII through

two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).  Although this case is at a preliminary stage, reference to the avenues of proof serves to inform a court's evaluation of a motion to dismiss or for summary judgment.  *Cf. Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997).  The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g., Young*, 135 S. Ct. at 1345 (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination.  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).  Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the

plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the motion to dismiss stage, however, these approaches merely serve to inform a court's evaluation of the allegations. *Cf. Pettis*, 592 F. App'x at 160 (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." The Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Thus, the Court said: "[A]n

employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also Stennis v. Bowie State Univ.*, 716 Fed. App'x 164, 166 n.2 (4th Cir. 2017) (per curiam); *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1162 (2016).

As the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544. *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309. On the other hand, in *Twombly*, the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of *Twombly* is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684; *accord Woods*, 855 F.3d at 647.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies . . . ." The question at the motion to dismiss stage is whether the plaintiff has stated "a plausible claim for relief under Title VII . . . ." *Ciociola v. Balt. City Bd. of Sch. Commissioners*, CCB-15-1451, 2016 WL 125597, at *4 (D. Md. Jan. 12, 2016).

### 2. Count I: "Racial Discrimination and Discrimination Based on Color"

In Count I, Dr. Okusami alleges "discrimination based on the Plaintiff's race and color in violation of Title VII." ECF 1, ¶ 22. His claim of racial discrimination is "based on the numerous

28

incidents of discriminatory treatment experienced by Plaintiff . . . and being treated differently from and less preferably than similarly situated Caucasian employees by not being properly compensated for testifying in court." *Id.*

"Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

In this case, Dr. Okusami pursues Count I under the disparate treatment theory. Disparate treatment occurs when an employer has treated an employee "'less favorably than others because of' a protected trait." *Ricci*, 557 U.S. at 577 (citation omitted).

The elements of a prima facie case of discrimination based on disparate treatment are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citation omitted), *aff'd*, 566 U.S. 30 (2012).

An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).

In a disparate treatment case, the plaintiff must also establish "'that the defendant had a discriminatory intent or motive' for taking a job related action." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 135 (2000) ("The ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination."). "Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'" *Raytheon Co.*, 540 U.S. at 52 (2003).

As an African American, plaintiff is a member of a protected class. Moreover, his employment was terminated, which is clearly an adverse employment action. *See Burlington,* 524 U.S. at 761 ("A tangible employment action constitutes a significant change in employment status, such as . . . firing . . . ."). The Complaint also alleges that Dr. Okusami was treated differently as a result of his race, and he specifically identifies two Caucasian employees as comparators: Mary Lou Perkins and Janet Hendershot.

The Department contends that Perkins and Hendershot are not similarly situated to Dr. Okusami. ECF 9-1 at 9. In particular, the defense argues that plaintiff "differs from these employees both in the nature of their employment, but also in the work that they perform." *Id.* at 10. Pursuant to plaintiff's Contract (ECF 9-2), Dr. Okusami was "a special payments payroll employee." *Id; see also* S.P.P. §§ 13–101 *et seq.* (setting out guidelines for State contract employment). Therefore, for purposes of discipline, Dr. Okusami "was bound by the contract, which contained an at-will termination clause." ECF 9-2 at 10.

Article I of the Contract, titled "Nature of Contract," provides that Dr. Okusami, the "Employee," is "employed as a contractual employee pursuant to [S.P.P. §§ 13–101 *et seq.*]." ECF 9-2 at 1. Further, it provides: "The Employee is not a Maryland State Employee, and is not entitled to the benefits afforded employees such as retirement, paid holidays, certain employer-paid or shared benefits, salary increments, etc." *Id.* Article XI, titled "Termination," states, in relevant part, *id.* at 3: "This Contract is an 'at-will' employment contract. As such, the Thomas B. Finan

Center may, in its sole discretion and without cause, terminate this Contract at any time. Likewise, the Employee may terminate this Contract at any time for any reason or no reason."

In addition, the Department contends that Dr. Okusami "is not similarly situated based on the work he was hired to perform compared with the work that Mary Lou Perkins and Janet Hendershot were hired to do." ECF 9-1 at 10. As a contract employee, "Dr. Okusami performed 'services that cannot be performed by assignment or hiring of any nontemporary employee.'" ECF 9-1 at 10 (quoting S.P.P. § 13–202(a)(1)). Moreover, "the services that he performed were considered 'infrequent,' 'needed for a limited time,' 'unusual,' or were needed 'to be implemented quickly and for which there is no reasonable alternative.'" ECF 9-1 at 10 (quoting S.P.P. § 13–202(a)(3)). Pursuant to S.P.P. § 13–204(3), the Secretary of the Department of Budget and Management "may not continue certification for any contractual employee if the Secretary determines that the services performed under the contract regularly are performed on a basis that is at least equal to 50% of the work responsibility of a full-time permanent employee." *See* ECF 9-1 at 10.

Moreover, defendant points out that plaintiff holds "a medical license and performed the work of a staff psychiatrist," whereas Perkins is a licensed social worker and served as the "Forensic Coordinator," and Hendershot is not an M.D., as plaintiff suggests, but served as the "Forensic Psychology Chief." *Id.* at 10-11. The Department acknowledges that "all have some responsibility to the patients." But, it argues that "[e]ach of these three people has a different license" and "each observes the patient within the scope of their license and background." *Id.* at 11.

According to the Department, Perkins and Hendershot "had specific job responsibilities to testify on behalf of the Thomas B. Finan Center's *forensic* medical evaluation team." ECF 9-1 at

11 (emphasis in original). But, as to plaintiff's court-related testimony, the Department baldly posits: "Any testimony that Dr. Okusami gave was done in his individual capacity because he had been subpoenaed by the defense attorney, and he was not appearing as an agent" of the Center. *Id.* As a result, argues the Department, plaintiff could have sought payment for his time from the defense attorney who decided to subpoena him for that purpose. *Id.*

Plaintiff counters that he, Perkins, and Hendershot shared the same supervisor. ECF 12-1 at 4. In addition, plaintiff argues that although Perkins and Hendershot "were both full-time State employees, Plaintiff's contractual status did not obfuscate the similarities between his colleagues given that per Maryland statute, [] contractual employees . . . had an employer-employee relationship with the State, and the State furnished his necessary tools and place to work, and had a right to control and direct the details, means, and results of the performance of the services for which the Plaintiff was contracted to perform." *Id.* (citing S.P.P. § 13(a)(3)(i)-(ii)). Also, he observes that all three employees "shared the responsibility for observing the patient within the scope of their respective professional backgrounds, and participating in the formation of an individual treatment plan for the patient, which in turn becomes the opinion of the facility." ECF 12-1 at 4-5 (citing S.P.P. § 10–704-09)).

To be sure, Okusami and his colleagues have distinct but related academic training and professional responsibilities as to the patients. Okusami, Perkins, and Hendershot had the same supervisor, and each had the responsibility to observe and assess patients and create ITPs. *See Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 F. App'x 255, 257 (4th Cir. 2007) ("If different decision-makers are involved, employees are generally not similarly situated.").

The Contract expressly established an employer-employee relationship between plaintiff and defendant. ECF 9-2 at 1. As a contractual State employee, plaintiff was not entitled to the

same benefits as the comparators, such as retirement or paid holidays. *Id.* But, he nonetheless was an employee. And, the Contract is silent as to whether plaintiff was entitled to be paid if subpoenaed to testify in relation to his professional duties. *See* ECF 9-2. It certainly does not preclude payment. And, it is curious that the State would claim that a physician whose responsibilities require him to conduct a forensic evaluation is not acting within the scope of employment when subpoenaed as a witness with regard to such an evaluation.[6]

At this juncture, plaintiff has offered sufficient allegations to show that he is similarly situated "in all relevant respects to [his] comparators," Perkins and Hendershot. *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Accordingly, Count I states a claim based on race discrimination under Title VII.

### 3. Count II: "Harassment and Hostile Work Environment"

In Count II, Dr. Okusami alleges that he was subjected to "a hostile working environment in violation of Title VII" because "the harassing conduct was unwelcome, based on Plaintiff's race and color, and sufficiently sever [sic] and pervasive to alter the conditions of Plaintiff's employment[.]" ECF 1, ¶ 28.

An employer violates 42 U.S.C. § 2000e-2(a)(1) "by requiring an African-American employee to work in a racially hostile environment." *Boyer-Liberto*, 786 F.3d at 277; *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986). A hostile environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment . . . .'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).

---

[6] Even so, the failure to pay plaintiff does not necessarily amount to race discrimination.

To state a *prima facie* claim under Title VII for hostile work environment based on race, the plaintiff must allege that there was: "'(1) unwelcome [offensive] conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)); *see also Ray*, 909 F.3d at 667.

Hostile work environment claims may involve "a series of days or perhaps years . . . ." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, for hostile work environment claims, "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*

To satisfy the second element of a hostile work environment claim, the plaintiff must demonstrate that he was harassed or otherwise discriminated against "because of" his protected class. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (citing *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)). The plaintiff may satisfy this burden by showing that, "but for" his protected class, he would not have suffered discrimination. *Id.* To be sure, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008)).

As to the third element of a hostile work environment claim, a hostile work environment exists under Title VII when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult . . . .'" *Boyer-Liberto*, 786 F.3d at 281 (quoting *Jordan v. Alternative*

34

*Resources Corp.*, 458 F.3d 332, 339 (4th Cir. 2006)) (some quotations and citation omitted); *see Harris*, 510 U.S. at 21; *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 158 (4th Cir. 2018). The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *Harris*, 510 U.S. at 21-22. Thus, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale*, 523 U.S. at 81); *see Nnadozie*, 730 F. App'x at 158. However, the plaintiff does not need to demonstrate that the work environment is "psychologically injurious." *Id. Harris*, 510 U.S. at 21-22.

Notably, "viable hostile work environment claims often involve repeated conduct. . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (citing *Morgan*, 536 U.S. at 115-17). But, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).

Moreover, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted). And, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted); *see also*

*Boyer-Liberto*, 786 F.3d at 294. Similarly, "complaints premised on nothing more than 'rude treatment by [coworkers]', 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.'" *Sunbelt Rentals, Inc.*, 521 F.3d at 315-16 (internal citations omitted); *see Nnadozie*, 2018 WL 1830935, at *8.

The Court reiterated in *Boyer-Liberto*, 786 F.3d at 278 (citation omitted): "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *See also, e.g., E.E.O.C. v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) (quoting *Ziskie*, 547 F.3d at 227) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'"); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

In sum, the determination as to "severe and pervasive" is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Moreover, "[n]o single factor is dispositive, as [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (internal citations and quotation marks omitted).

Here, Dr. Okusami asserts that he "was cornered and castigated by and in front of his peers simply because of Plaintiff's unwillingness to engage in unnecessary, improper, and unethical

treatment of fragile mental health patients[.]" ECF 1, ¶ 28. He claims that such "harassment . . . was unwelcome as the Plaintiff did not say or do anything which would warrant the treatment he received." *Id.*

In support of his claim, Dr. Okusami asserts: "His harassment was based on his race as his Caucasion [sic] peers were not pressured by their supervisors or one another to falsify sworn medical testimony." *Id.* In addition, he claims: "Mr. Cullen, a Caucasian male, did not attend hearings for the purpose of scowling at or intimidating any Caucasion [sic] mental health providers who were the Plaintiff's Caucasion [sic] peers. Nor were Plaintiff's Caucasion [sic] peers ever subjected to public beration by Mr. Cullen." *Id.*

According to plaintiff, Cullen also created a "hostile work environment" when, "from March 2016 until November 2016," he "would repeatedly tell [Dr. Okusami] that he . . . was aware of staff complaints regarding the Plaintiff, but would never present any formal complaints to the plaintiff upon plaintiff's request in his attempt to file any necessary response(s) to his co-workers' supposed allegations." *Id.* ¶ 29. And, plaintiff points to instances where other staff members were directed not to comply with plaintiff's directives concerning patients. Further, in another case, Dr. Okusami "was withdrawn by Mr. Cullen from testifying at a release hearing and replaced with Dr. Millis [sic] who had previously had only marginal contact with the patient." *Id.* Until Dr. Okusami's termination, Cullen "instruct[ed] [Dr. Okusami] not to use the word 'competent' in the medical records of patients which [sic] Plaintiff was treating." *Id.* But, "[n]one of Plaintiff Okusami's similarly situated Caucasian peers, including [] Hendershot, were subject to such baseless criticism of their subjective medical notations." *Id.*

The Department asserts that "Dr. Okusami has not alleged sufficient facts that any of the alleged unwelcome conduct occurred because of his race/color and he has failed to allege conduct

that is sufficiently severe or pervasive to alter the conditions of his employment." ECF 9-1 at 12. I agree. The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher*, 524 U.S. at 788. The facts alleged by Dr. Okusami, in the light most favorable to him, are a far cry from the kinds of allegations that have been found sufficient to state a claim for hostile work environment.

As discussed, plaintiff claims that he was challenged in front of coworkers regarding the scope of his court testimony and that Caucasian employees were not similarly treated, ECF 1, ¶ 10; that Cullen attended a hearing at which plaintiff was a witness, but not the hearings of Caucasian employees, *id.* ¶ 19; that he was not provided with the substance of alleged staff complaints, *id.* ¶ 14; and his treatment recommendations were repeatedly overruled, but that Caucasian employees were not subject to such conduct. *Id.* ¶ 16.

These allegations are woefully inadequate in regard to the element of severe or pervasive so as to alter the terms or conditions of employment. *Strothers*, 895 F.3d at 331. Therefore, I conclude that plaintiff has not adequately pleaded facts to support his hostile work environment claim. Accordingly, I shall grant the Motion as to Count II.

### 4. Count III: "Retaliation"

In Count III, plaintiff asserts a claim of retaliation under Title VII. Title VII prohibits an employer from retaliating against an employee who exercises his Title VII rights. 42 U.S.C. § 2000e-3(a); *see, e.g., Ray*, 909 F.3d at 669; *Netter*, 908 F.3d at 937; *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011). The purpose of Title VII's antiretaliation provision is to preserve "unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

In order to establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC"; (2) the employer took an adverse action against the plaintiff; and (3) "'the protected activity was causally connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted); *see Strothers*, 895 F.3d at 327; *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 578 (4th Cir. 2015); *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). As with a substantive discrimination claim, the *McDonnell Douglas* framework applies at trial: "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle, supra*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

A plaintiff must allege facts to show that he engaged in protected activity. The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *Navy Fed. Credit Union*, 424 F.3d at 406; *see Netter*, 908 F.3d at 937; *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

The statute outlines the activities that constitute participation. These include making a charge; testifying; assisting; or participating in any manner in an investigation, proceeding, or hearing under Title VII. *Id.*

The Fourth Circuit has "articulated an expansive view of what constitutes oppositional conduct, recognizing that it encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters*, 796 F.3d at 417 (internal quotation marks omitted); *see also Stennis*, 716 F. App'x at 167. "'Title VII is not a general bad acts statute, however, and it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII.'" *Stennis*, 716 F. App'x at 167 (quoting *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011)).

The plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the firing was pretextual." *Netter*, 908 F.3d at 938; *see Foster v. Univ. of Md. – E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

The second element of the prima facie case is an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.) In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.* In a retaliation claim, the standard for an adverse action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at

68 (quotation marks and citations omitted). Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).

Moreover, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. Thus, even under the "lower bar" applicable to Title VII retaliation claims, the issuance of a personal improvement plan does not constitute adverse action. *Sillah v. Burwell*, 244 F. Supp. 3d 499, 517 (D. Md. 2017) (citing cases); *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013); *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011).

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff at trial must show that the employer took the adverse action "*because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). *See Price*, 380 F.3d at 213 (although period of nine to ten months between

protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Conversely, mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"). And, pursuant to the Supreme Court's ruling in *Nassar*, 570 U.S. at 362, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

In this case, Dr. Okusami alleges that he was discharged after engaging in two protected activities that occurred on August 12, 2015, and October 4, 2016. ECF 1, ¶ 33. He claims these constitute "opposition" activities because he was "staging informal protests and communicating his opinion in order to bring attention to his employer's discriminatory activities." *Id.*

In particular, Dr. Okusami references his correspondence of August 12, 2015, sent to Cullen and Dr. Millis. The correspondence, quoted earlier, refers to Department practices that plaintiff believed to be unlawful. *See* ECF 1, ¶¶ 11, 12.

The activity that occurred on October 4, 2016, concerns "a meeting with members of the forensic medical evaluation treatment team." ECF 1, ¶ 17. Dr. Okusami alleges, that during the meeting, Cullen scolded him for taking positions that differed from the Center's position and that Dr. Okusami was jeopardizing his employment by taking such contrary positions. *Id.* Dr. Okusami

responded by stating that he would fulfill his obligations under Maryland law to testify on behalf of his patients and that he would not deny his patients the benefit of his testimony. *Id.*

In its Motion, the Department argues that as to both events, "Dr. Okusami has insufficiently alleged facts to support his allegation that he engaged in a protected activity." ECF 9-1 at 16. Further, defendant asserts that plaintiff "does not make any reference to alleged discriminatory conduct on the basis of race or color." *Id.* at 16-17.

In support, the Department relies on *Bonds*, 629 F.3d at 383-84. In that case, a National Institutes of Health employee opposed the retention of cell lines created in the course of sickle-cell clinical drug trials from genetic material provided by African Americans. *Id.* 384. The plaintiff claimed that she was opposing racial discrimination by seeking to destroy the lines and maintained that such conduct was protected under Title VII. *Id.* The Fourth Circuit determined that the plaintiff's opposition to the use of the cell lines did not constitute protected activity under Title VII; *see also Lightner v. City of Wilmington*, 545 F.3d 260, 264 (4th Cir. 2008) (observing that plaintiff "has tried to take a statute aimed at discrete forms of discrimination and turn it into a general whistleblower statute, which of course Title VII is not.").

Such an analysis leads to the same conclusion here. The Complaint alleges that on August 12, 2015, and October 4, 2016, plaintiff opposed the Center's position on patient treatment and, on that basis, the Department subsequently fired him. Those facts may be plausible. But, even if they are, Title VII "does not prohibit private employers from retaliating against an employee based on [his] opposition to discriminatory practices that are outside the scope of Title VII." *Bonds*, 629 F.3d at 384.

Plaintiff has not pleaded sufficient allegations to show that the activities of August 12, 2015, and October 4, 2016, are protected under Title VII. As such, the Motion shall be granted as to Count III.

## IV. Forum Selection Clause

The parties dispute whether the Personal Services Contract requires the parties to litigate this case in a Maryland State court. Article XIV of the Contract contains a choice of law clause and a forum selection clause. It states, as follows: "This Contract is governed by the laws of the State of Maryland, the parties hereby expressly agree that the courts of the State of Maryland shall have exclusive jurisdiction to decide any question arising hereunder." ECF 9-2 at 4.

Defendant contends that, pursuant to the forum selection clause, the parties have "agreed that Maryland's State courts, and not federal court, have exclusive jurisdiction to hear Dr. Okusami's claims arising related to his employment with the Statement of Maryland." ECF 9-1 at 17. The Department devotes only six lines to this argument and cites no cases in support. *See id.*

Plaintiff points out that his State common law claims "are pending in the appropriate state court jurisdiction." ECF 12-1 at 9 (citing ECF 12-6); *see Okusami, M.D. v. Cullen, et al.,* Case No. C-01-CV-18-000425.

Because defendant relies on the Contract, I must review the principles of contract formation and contract construction.

## A.

Maryland courts follow the rule of *lex loci contractus,* applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Am. Motorists Ins. Co. v. ARTRA Group, Inc.,* 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995). Here,

the Contract contains a choice of law clause, stating: "This Contract is governed by the laws of the State of Maryland[]." ECF 9-2 at 4. Accordingly, I will apply Maryland law in addressing the Motion.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g., Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, ___ F. App'x ____, 2019 WL 181453, at *2 (4th Cir. Jan. 14, 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

"In determining whether there was an enforceable contract, [courts] began [the] analysis by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual

assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the

parties would have meant at the time the agreement was effectuated."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). "Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted).

The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

To determine the parties' intention, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'"

*DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted).

A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g., Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

The determination of whether a contract is ambiguous is a question of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003). Notably, a contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). Rather, a contract is ambiguous "when the language of the contract is susceptible of more than one meaning to a reasonably prudent person." *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999).

To ascertain whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'" *Forty W. Builders*, 178 Md. App. at 377, 941 A.2d at 1209 (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d

936, 942 (2001)).

Notably, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

## B.

Mandatory forum selection clauses are presumptively enforceable. *See, e.g., CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 771 (D. Md. 2009); *Davis Media Group v. Best Western Int'l, Inc.*, 302 F. Supp. 2d 464, 467 (D. Md. 2004); *Eisaman v. Cinema Grill Systems, Inc.*, 87 F. Supp. 2d 446, 449 (D. Md. 1999). A mandatory selection clause contains "clear language showing that jurisdiction is appropriate only in the designated forum." *Davis Media*, 302 F. Supp. 2d at 467. By contrast, a permissive clause "permits jurisdiction in the selected forum without precluding it elsewhere." *Id.* Of import here, the Fourth Circuit has said: "A general maxim in interpreting forum selection clauses is that an agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion." *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 (4th Cir. 2007). That is, a forum selection clause is permissive unless specific language excludes other jurisdictions.

For example, in *Rihani v. Team Exp. Distributing, LLC*, 711 F. Supp. 2d 557 (D. Md. 2010), the forum selection clause stated that "venue for all actions arising out of or in any way related to this Agreement *shall be irrevocably set* in Howard County, Maryland." *Id.* at 558 (my emphasis). The court concluded that this language clearly excludes any other proper jurisdictions and expressly mandates that any related actions must take place in Howard County. *Id.* at 561. Similarly, in *FindWhere Holdings, Inc., v. Systems Environmental Optimizations, LLC*, 626 F.3d 752 (4th Cir. 2010), the Court concluded that the phrase "any dispute or legal action . . . *shall lie exclusively in*" rendered the forum selection clause mandatory and excluded any other proper venues. *Id.* at 754 (emphasis added).

The venue provision contained within Title VII states, in pertinent part:

> Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought *in any judicial district in the State in which the unlawful employment practice is alleged to have been committed,* in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.

42 U.S.C. § 2000e–5(f)(3) (emphasis added).

Some district courts have refused to enforce a forum selection clause in a Title VII case, concluding that such a clause violates the venue provision in Title VII. *See Smith v. Kyphon*, 578 F. Supp. 2d 954, 959 (M.D. Tenn. 2008); *Thomas v. Rehabilitation Servs. Of Columbus, Inc.*, 45 F. Supp. 2d 1375 (M.D. Ga. 1999); *see also DeBello v. VolumeCocomo Apparel, Inc.*, 720 F. App'x 37, 40-41 (2d Cir. 2017 (observing that it has declined to "'adopt a per se rule' giving contractual forum selection clauses 'dispositive effect where the civil rights laws are concerned,' noting the 'strong federal public policy favoring enforcement of the civil rights laws so important

to the advancement of modern society,'" but finding on the facts of the particular case that plaintiff had not shown in his Title VII case that the forum selection clause should not be enforced). Other district courts have rejected this argument on various grounds. *See, e.g., Tracy v. Loram Maint, of Way Inc.*, 5:10-cv-102-RLV, 2011 WL 2791257, at *2 (W.D.N.C. 2011) (enforcing a forum selection clause despite the venue provisions under Title VII).

In this case, the language of the Contract provides that, as to a claim concerning the Contract, "the courts of the State of Maryland shall have exclusive jurisdiction to decide any question . . . ." But, this case, although rooted in the Contract, does not involve a contract claim. Accordingly, the forum selection clause is inapplicable here.

## V.     Conclusion

For the reasons stated above, I shall GRANT the Motion with respect to Counts II, III, and IV. But, I shall DENY the Motion as to Count I.

An Order follows, consistent with this Memorandum Opinion.


Date: February 28, 2019                            _____/s/_____

                                                   Ellen L. Hollander
                                                   United States District Judge