IN THE UNITED ST ATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TAIWO OKUSAMI, M.D.,

    *Plaintiff*,

v.

MARYLAND DEPARTMENT OF
HEALTH AND MENTAL
HYGIENE,

    *Defendant*.

Civil Action No. ELH-18-1701

## MEMORANDUM OPINION

Plaintiff Taiwo Okusami, M.D., who is African-American, worked as a Staff Psychiatrist at the Thomas B. Finan Center in Cumberland, Maryland from 2011 until his termination in November 2016. He has sued his former employer, the Maryland Department of Health and Mental Hygiene (the "Department" or "DHMH"), defendant, alleging employment discrimination based on race. ECF 1 (the "Complaint").[1]

The Complaint contains three claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"): discrimination on the basis of race (Count I); harassment and hostile work environment (Count II); and retaliation (Count III). ECF 1, ¶¶ 21-37. Plaintiff also brought a claim for wrongful discharge under Maryland law (Count IV). By Memorandum Opinion (ECF 14) and Order (ECF 15) of February 28, 2019, I dismissed Counts II, III, and IV of the Complaint.

---

[1] Effective July 2017, the Maryland Department of Health and Mental Hygiene was renamed the Maryland Department of Health. *See* Md. Code (2015 Repl. Vol., 2018 Supp.), §§ 1-101, 2-101 of the Health-General Article. It is a principal department of the State government.

The Department has now moved for summary judgment as to Count I (ECF 31), supported by a memorandum of law.  ECF 31-1 (collectively, the "Motion").  The Motion is supported by numerous exhibits.  ECF 31-2 to ECF 31-14.  Plaintiff opposes the Motion (ECF 33), supported by a memorandum of law (ECF 33-1) and many exhibits.  ECF 33-3 to ECF 33-12.[2]  Plaintiff also filed a supplement to his opposition (ECF 34), with additional exhibits.  *See* ECF 34-1 to ECF 34-5.  I shall refer to ECF 33 and ECF 34 collectively as the "Opposition." Defendant has replied (ECF 37) and submitted additional exhibits.  ECF 37-1 to ECF 37-7.[3]

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

# I.  Factual Background[4]

## A.

Plaintiff is a licensed Maryland physician, specializing in the field of psychiatry.  ECF 31-2 (Okusami Deposition) at 28.  He is board certified in child and adolescent psychiatry.  *Id.* at 30.  However, he is not board certified or board eligible in forensic psychiatry.  *Id.* at 29.

---

[2] For unknown reasons, the same submission is also docketed at ECF 32.  However, the memorandum and the exhibits were filed only with ECF 33, and not with ECF 32.  Therefore, I shall cite only to ECF 33.

[3] In this Memorandum Opinion, I cite to the page references that appear on the electronic docket.  The electronic pagination does not always correspond to the page number that appears on a particular document.

I note that the parties filed duplicates of some exhibits, such as deposition excerpts.  *See*, *e.g.*, ECF 31-3 (Cullen Dep.) and ECF 34-2 (Cullen Dep.).  Generally, I have not included duplicate citations.

[4] Within the last few years, Dr. Okusami developed vocal cord paralysis, which made it difficult for him to speak and challenging to understand him.  ECF 31-2 at 8; ECF 34-1 at 3.  As a result, his deposition took place over several days.  When it became difficult for him to speak, plaintiff typed his responses and his counsel read the typed responses into the record.  *See* ECF 31-2 at 15-16.

Dr. Okusami attended medical school in Nigeria and came to the United States in 1976 for training in psychiatry. *Id.* at 5, 6. He completed his residency at Virginia Medical College in Richmond, Virginia and Northern Virginia Mental Health. *Id.* at 6. He also completed a two-year fellowship at "George Washington and Children's Hospital." *Id.* at 7. In 1980, he began work at Howard University and then entered private practice. *Id.* at 18.

Plaintiff joined the Thomas B. Finan Center (the "Center") in 2011 as a Staff Psychiatrist. *Id.* at 32. He continued to see patients in private practice until 2015. *Id.* at 25. He stopped seeing patients privately because he was "often on-call" at the Center and "was not able to meet their needs adequately." *Id.* at 24.

The Center, located in Cumberland, is a State-run, in patient psychiatric facility. *See* Md. Code (2019 Repl. Vol.), § 10-406(a)(6) of the Health-General Article; ECF 1, ¶ 2. Most of the Center's patients are admitted pursuant to a judicial commitment order after a finding that the defendant either is not competent to stand trial in a criminal case or not criminally responsible for his or her crimes. *See* Md. Code (2015 Repl. Vol., 2018 Supp.), §§ 3–101 *et seq*. of the Criminal Procedure Article; ECF 31-1 at 1-2.[5]

Dr. Okusami joined the Center in April 2011 as a Staff Psychiatrist, after he received an "invitation letter" from John Cullen. ECF 31-2 at 32. Cullen, who is not a physician, previously served as the Chief Operating Officer of the Center and later as "the CEO of the Department of Health." ECF 31-3 (Cullen Deposition) at 6; ECF 37-5 (Cullen Deposition) at 11.

From the outset of plaintiff's employment in 2011, he worked pursuant to a series of one-year contracts. ECF 10-4 ("Department Statement Position") at 6; *see*, *e.g.*, ECF 31-9 (the 2011 Contract). According to plaintiff, Cullen and Dr. Linda de Hoyos "assured" him that "the only

---

[5] At ECF 31-1 at 2, the Department cites "Deposition of John Cullen at 39:9-15" for this proposition. But, ECF 31-3, the Cullen deposition, does not include page 39.

reason [plaintiff] would not be renewed is if [he lost his] license to practice or committed a crime." ECF 31-2 at 60.  And, plaintiff "expected to work until [he] retired."  *Id.*

The relevant Personal Services Contract covered the period from July 1, 2016, through June 30, 2017.  ECF 31-10 (the "Contract").  Under the Contract, plaintiff was "a contractual employee," pursuant to Md. Code (2015 Repl. Vol., 2018 Supp.), §§ 13–101 *et seq.* of the State Personnel and Pensions Article ("S.P.P.").  Although the Contract specified that it "establishe[d] an employer-employee relationship" between the Center and Dr. Okusami, it also stated:  "The Employee is not a Maryland State Employee, and is not entitled to the benefits afforded employees . . . ."  ECF 31-10 at 1.  Moreover, the Contract expressly provided that plaintiff's employment is "at-will."  *Id.* at 3.  Therefore, the Center "may, in its sole discretion and without cause, terminate this Contract at any time."  *Id.*  Plaintiff, too, could terminate the Contract at any time and for "no reason."  *Id.*

Under the Contract, Dr. Okusami "was to be paid $120.00 per hour," based on "a regular workweek consisting of 40 hours."  *Id.*  Plaintiff's total compensation for the one-year term "was not to exceed $249,600.00."  *Id.* at 2.

Services at the Center are provided by "two distinct teams" of staff:  the treatment team and the forensic team.  ECF 31-4 (Hendershot Deposition) at 19; ECF 31-3 at 19.  The teams serve discrete roles; the treatment team treats the patient with regard to his or her mental health issues, while the forensic team evaluates the patient with regard to the patient's legal matters.  ECF 31-3 at 20; ECF 31-5; ECF 31-6 (Perkins Deposition) at 6; ECF 31-8 (Forensic Team Minutes of 6/6/16).

Janet Hendershot, Ph.D., a psychologist at the Center, explained that in psychiatry and other mental health fields, there is an effort to avoid "dual relationships."  ECF 31-4 at 19.  She said, *id.*:

> So if someone is providing forensic evaluations, they should not be providing treatment because that would interfere with the therapeutic relationship. And saying, in the other way, if they were providing treatment, but then going to be doing the evaluation as well.  We can't always get around that because if we're—we are in a very rural area with limited staff, although right now we're fully staffed, but whenever possible, we try to avoid having that conflict of interest.

Dr. Okusami was part of the treatment team for Cottage One, which housed about nineteen people.  ECF 31-6 at 6; ECF 31-4 at 9.  Dr. Okusami was never a member of the forensic team.  ECF 31-12 (Department's answers to interrogatories) at 2; ECF 31-6 at 6.  For much of the relevant time, the forensic team consisted of Mary Lou Perkins, a social worker; Dr. Hendershot, a psychologist; and David Millis, M.D., an African-American who was the Center's Clinical Director.  ECF 31-12 at 2-4; ECF 37-5 at 9.

The Department submitted a document titled "Forensic Assessments And Services." ECF 31-5.  It describes the "Forensic Evaluation Team" as "the three Center clinicians (a psychiatrist, a psychologist and a social worker) who are charged with the development, provision and/or oversight of the Center's interactions with the correctional and court system related to the Center's forensic programing, training and service delivery."  *Id.* ¶ 12.  Further, the document provides, *id.* at 3:

> Forensic clinical direction for the team is provided by a psychologist designated by the Director of Psychology.  A staff social worker provides administrative forensic coordination.  A psychiatrist provides psychiatric evaluation and consultation.  The psychiatrist is typically the Clinical Director, but this role can be assumed by any psychiatrist on staff who has completed the DHMH Forensic Evaluator Training.

The Forensic Evaluation Team is "charged with accomplishing" various tasks, including: "Interface with the BHA Office of Forensic Services (OFS), correctional facilities and authorities, state's attorneys, public defenders and other lawyers, judges and courts, community-based forensic evaluators and aftercare service providers to assure appropriate, effective, and efficient delivery of forensic evaluation services." *Id.*

According to forensic team meeting minutes from June 6, 2016 (ECF 31-8), 35 out of 71 patients at the Center were "considered inpatient forensic . . . ." ECF 31-4 at 9. Twenty were found "incompetent to stand trial," while twelve had been found not criminally responsible and were "waiting for a conditional release." *Id.* at 9, 17. Two were sent from a detention facility and were found competent, and two were at the Center "purely for treatment." *Id.* at 9-10.

Cullen testified about the court testimony provided by employees of the Center, characterizing it as "wide open." ECF 31-3 at 8. He stated: "We do IVA hearings. We do med panels. We do competency hearings so again, depending on the court would be who would go." *Id.* Issues as to competency were the responsibility of Dr. Hendershot "and the forensic team." *Id.*

Perkins testified that the forensic team, of which she was a member, would meet with the treatment team, of which Dr. Okusami was a member. ECF 31-6 at 6. She stated that the treatment team "consisted of the treating psychiatrist, psychologist, one or two social workers, rehab staff and addictions nursing—addictions staff, nursing staff. So they were the folks responsible for treating the patient." *Id.* As a member of the treatment team, plaintiff's job duties included the following, ECF 33-10 (undated work description for "Physician Clinical Staff"):

> Plans and participates in the medical care of patients in a State facility, local health department or other agency;

6

Develops patient treatment plans based on assessments and diagnoses;
Implements and oversees implementation of treatment plan;
Examines and treats patients based on diagnoses;
Prescribes medications and treatments as indicated by diagnoses;
Orders various tests and analyses to provide information on patient's condition;
Analyzes reports and findings in order to determine a patient's progress and adjusts treatment plan accordingly;
Reviews patients' records to assure their adequacy and proper administration;
Advises health care support staff of appropriate treatment techniques needed for individual cases;
Conducts clinical rounds and reviews progress of patients;
Meets with patients and their families to discuss treatment plans and address concerns;
Attends staff meetings and participates in diagnostic and treatment discussions, lectures, seminars and case presentations;
Performs other related duties.

Dr. Okusami never completed the training to become board certified in forensic psychiatry. ECF 31-2 at 29. As plaintiff put it, he "had no need to get another board certification." *Id.* Nor has he been "qualified as an expert in forensic psychiatry by a court or in an administrative proceeding[.]" *Id.* at 30. But, his "training in [his residencies] and fellowships included rotations in forensic [psychiatry]," and he also took continuing medical education courses in forensic psychiatry. *Id.* at 29. Moreover, plaintiff asserted that his training qualifies him to work with patients with court involvement, and his "license does not restrict [him] from seeing any patients with mental illness[.]" *Id.* at 30.

Until July 8, 2016, Dr. Okusami was directly supervised by Dr. Millis. As noted, he is African-American and previously was the Clinical Director of the Center. ECF 31-2 at 46; ECF 37-5 at 9; 31-12 at 4. Dr. Millis resigned as of July 8, 2016. ECF 37-5 at 10.[6]

---

[6] Dr. Okusami testified that Dr. Millis was not involved in any incidents of alleged discrimination. ECF 31-2 at 46-47.

7

From July 9, 2016, until November 1, 2016, Cullen was plaintiff's supervisor with respect to administrative matters.  ECF 37-5 at 10.  Cullen served as the Chief Operating Officer of the Center for about 20 years.  ECF 31-3 at 6-7.  In July 2015, he became the "CEO of the Department of Health."  *Id.* at 6.  He succeeded Judy Hott, a white woman who held the position for about 20 years.  *Id.* at 7.  Previously, Archie Wallace, an African American male, served as the CEO.  *Id.*

Dr. Okusami initially considered Cullen a "friend."  ECF 31-2 at 34.  But, he claimed that their "relationship changed" when Cullen became acting CEO.  *Id.*

By letter of October 17, 2016, Cullen terminated plaintiff's employment.   The letter stated, ECF 31-13:

Dear Dr. Okusami:

Pursuant to our Special Payments contract with you, the Center may terminate your contract without cause.

I have decided to terminate your contract effective November 1, 2016.

Please take the next two weeks to finish all of your charting and transitioning your patients to Dr. Passarell.

I would like to thank you for your 5 plus years here at the Center.

DHMH's answers to interrogatories (ECF 31-12) were signed by Cullen.  *Id.* at 14.  The Department stated that Dr. Okusami was an at-will employee.  *Id.* at 4.  And, Cullen maintained that the Center "exercised its right to terminate without cause."  *Id.*

Cullen has terminated four or five people without cause, including plaintiff.  ECF 31-3 at 10.  According to Cullen, none of the others were Black or African American.  *Id.*  But, they had the same type of personal services contract as Dr. Okusami.  *Id.* at 11.  Defendant submitted two of these termination letters as exhibits.  *See* ECF 37-6.

Dr. Okusami filed his charge of discrimination with the EEOC on December 30, 2016. ECF 33-14 at 2.  This suit followed on June 11, 2018.  ECF 1.

**B.**

At least by 2015, plaintiff's "role as a psychiatrist" was an issue at the Center.  Dr. Okusami sent correspondence to Cullen and Dr. Millis on August 12, 2015, stating, ECF 33-7 (emphasis in original):

> Dear Gentlemen: [7]
>
> I have been called to 2 meetings with you regarding my role as a psychiatrist. At both meetings, the last was on 8/11/15, you again informed me that DHMH's policy has restriction on my role as a psychiatrist: specifically that I cannot evaluate a patient's cognitive state in regards to the alleged crime they are charged with AND I cannot document my professional opinion with regards to my findings. At both meetings you threatened to terminate my employment if I did not comply.
>
> As I understand the duties of a Physician/Psychiatrist as licensed by the Board of Medicine, as regulated by the AMA and the APA, there is no restriction to a Psychiatrist's duty to evaluate a patient and that evaluation includes taking all elements of stressors (and legal issues are stressors) that *may* affect the patient's mental wellbeing or illness.
>
> I am also required by law to keep an accurate record of my treatment recommendations for each patient I evaluate.
>
> Please provide me the DHMH policy that limits my function as a Psychiatrist so I understand the rational [sic].
>
> These issues arose because in the course of my evaluating patients I have documented my opinions which apparently did not conform to the conclusion of the Forensic evaluators.
>
> As I under [sic] the responsibility of Forensic evaluation, the evaluator reviews all available medical records on the patient, interviews the patient and then write [sic] an opinion on whatever question the Court was asking. The evaluator's responsibility is to make a coherent, factual report. The evaluator is not bound by

---

[7] Dr. Okusami testified that by "gentlemen" he meant Cullen and Dr. Millis.  ECF 31-2 at 48.

any opinion I, as an Attending, may have written about the patient being evaluated.

I do not believe that I because I am a State employee requires me to give up medical responsibilities under the law; to do so will be a violation of the Hippocratic oath: to do no harm. To withhold a reasoned psychiatric opinion on a patient I have duly evaluated will be a violation of that oath.

The law requires that I have a patient-doctor relationship with any patient under my care, irrespective of how the patients are referred, and that includes a duty to offer the patient my treatment recommendation and is not limited to prescribing medication. It also includes psychotherapy during which I can offer the patient my opinion on how the mental illness may or may not be impairing the ability to understand the legal stressors he/she maybe [sic] facing and address the ability to understand all the necessary components involve [sic] in resolution of the stressor.

Now, what you are requiring of me, if confirmed by DHMH's policy, is essentially interfering with my duty as a Psychiatrist, which will also be a violation of the duties enumerated in the Medical Bylaws.

The argument that because I have been subpoenaed by the Defense Attorney and that my testimony which will be contrary to the Forensic opinion of DHMH's appointed evaluator will make the Hospital look foolish I do not find [to have] merit. The Hospital does not employ professionals with monolithic views. On the contrary it will show that the Hospital [is] independent and not an arm of the Justice Dept. The role of mental health professionals is to provide an opinion to help the Courts understand the role of mental illness, if any, in the deliberations Judges have to make.

The threat to any professional who may have a dissenting opinion is not warranted, especially in a Mental Health Agency.

In conclusion, please provide the DHMH policy you have cited as authority for restricting my practice of Psychiatry.

Plaintiff could not recall the date of the first meeting referenced in the letter, but at that meeting he was told "not to use the word competent." ECF 31-2 at 49. At the second meeting, Dr. Millis and Cullen insisted he give medication to a patient. *Id.* He testified that he told Dr. Millis that, "as the medical director, he could evaluate the patient or have another psychiatrist evaluate the patient before ordering [plaintiff] to give medication that [plaintiff] could not justify." *Id*. As a result of these conversations, Dr. Okusami "felt [he] was being harassed." *Id.*

at 50.  But, he did not "use that as an example of racism."  *Id.*  Indeed, he maintained that he

never claimed the meetings were racist.  *Id.* at 51.  Rather, "[t]he events [he] called racism [were]

after that letter. . . ."  *Id.*

In support of plaintiff's discrimination claim, plaintiff has identified two comparators:

Mary Lou Perkins, "LCSW" and "Forensic Coordinator," and "Janet Hendershot, M.D. a

Forensic Psychology Chief . . . ."  ECF 37-1 (Plaintiff's Answers to Interrogatory) at 2.[8]  Ms.

Perkins and Dr. Hendershot were not contractual employees of DHMH.  ECF 31-2 at 45.  And,

plaintiff testified that they were supervised by the "head of their different departments" and not

Dr. Millis.  *Id.*

Nevertheless, in plaintiff's answers to defendant's interrogatories, ECF 37-1, he claimed,

*id.* at 2-3:

> [T]hey were similarly situated to the Plaintiff in that they (as did the Plaintiff)
> interacted with and treated patients at the [Center] for competency and criminal
> responsibility evaluations, they (as was the Plaintiff) were members of the
> Defendants' [sic] forensic evaluation team, they testified (as did the Plaintiff) on
> behalf of the patients that were under their care and treatment, and with particular
> respect to Dr. Hendershot, Plaintiff Okusami, during the course of his
> employment with the Defendant, testified on more than ten (10) separate
> occasions on behalf of various patients regarding the methods, findings, and
> conclusions in forensic reports prepared by Dr. Hendershot.

Ms. Perkins's position description indicated that she is a "Social Worker II, Health

Services," with a working title of "Forensic Coordinator."  ECF 37-2 at 1.  She commenced

employment at the Center on February 1, 2008.  *Id.*  Dr. Hendershot's position description

specifies that she is "Psychology Chief."  ECF 37-3 at 1.

Dr. Hendershot has over 30 years of experience as a forensic psychologist, "beginning

with [her] state of Maryland employment in 1988."  ECF 31-4 at 13.   She testified about the

---

[8] Ms. Perkins signed her position form as an "LCSWC."  ECF 37-2 at 8.  Dr. Hendershot
signed as Ph.D., not M.D.  ECF 37-3 at 8.

qualifications of a forensic psychologist, *id.* at 12, noting that she is not a medical doctor and is not able to admit patients into a hospital.  *Id.* at 13.

For the most part, Dr. Hendershot was a staff psychologist for Cottage C, the continuing care unit, *id.*, and she was also "the clinical forensic coordinator." *Id.* at 15.  She stated that if she had ever been assigned to Cottage One with Dr. Okusami, "it would have been for a very short period of time." *Id.*  To her knowledge, Dr. Okusami did not draft any forensic reports, but "he co-signed. . .some reports, since all of the psychiatrists contributed at least the diagnosis and the clinical psychiatric medical issues." *Id.*

Dr. Okusami testified that he is a more qualified mental health professional than both Ms. Perkins and Dr. Hendershot.  ECF 31-2 at 40.  He explained, *id.* at 40-41:

> They certainly are not licensed to admit patients into a hospital.  Only psychiatrists are licensed and have the responsibility for the patient care.
>
> Other non-psychiatrists work under the supervision of psychiatrists and only see patients when the psychiatrist refers them. . . They are less qualified because they are not held accountable for anything that goes wrong with a patient.
>
> Certainly they have no risk of losing their licenses if anything goes wrong. That is why psychiatrists are named as the provider for patient care in a hospital.
>
> You can argue it's different qualification, but the training to become a psychiatrist, after completing medical school, is certainly more rigorous than being a psychologist or a social worker.

Dr. Hendershot was asked if she agreed with the statement that "psychiatrists are the most qualified mental health professionals recognized by the State of Maryland professional licensing board." ECF 31-4 at 13.  She responded, *id.* at 14:  "I would not agree to that."  She explained, *id.*:  "I believe that there are several disciplines that would qualify as being very important, including psychological.  And even though I don't have [hospital] admitting privileges at this time, I'm one of the people that can do the certs to lead to an admission."

12

Dr. Hendershot noted that there is a three-day forensic training conducted by the "Office of Forensic Services, which is now Office of Court-Ordered Evaluations and Placement." ECF 31-4 at 13. According to Dr. Hendershot, Dr. de Hoyos, who was the "primary psychiatrist on the forensic team, and also the forensic review board," did not attend the three-day forensic training. ECF 37-7 (Hendershot Deposition) at 6. Nor did Dr. Greiger, "a forensic psychiatrist through the military and federal government," who is white. *Id.* But, she testified that Dr. Greiger's "essential job functions have been clinical only. He has not made any decisions for. . . the forensic team," *id.* at 7, nor has he offered a forensic opinion. *Id.* at 8. Moreover, she was not aware of any complaints about his competence, nor did she recall him "expressing an opinion about a patient anymore than just a side comment." *Id.* at 9. Nor could she recall him testifying "beyond his role as a clinician." *Id.* at 11.

Perkins was present when Dr. de Hoyas asked Dr. Okusami to attend "the three-day forensic training in the midst of early issues with him refusing to understand forensic issues or protocols." ECF 31-6 at 7. Dr. de Hoyas "did not use the words 'I'm ordering you to go.' She asked [plaintiff] to go. She said she thought it would be helpful for him to go, and he said he didn't want to go." *Id.*

Cullen, too, was aware that Dr. Okusami had been asked to attend the three-day forensic training. ECF 31-3 at 13. He characterized this training as "required" and "not voluntary" for anyone who "wanted to be on the forensic team and go testify as part of the forensic team. . . ." *Id.* He also testified that the training was requested "so that even the unit psychiatrist could have a better understanding of the laws and the requirements in Maryland and what was actually needed when they went to court to testify about patients' competency, readiness to be moved along." *Id.* Indeed, all of the psychiatrists were "encouraged" to attend the training. *Id.* at 14.

Cullen was "concerned" that Dr. Okusami had not attended the training and did not understand the different roles of the treatment and forensic teams. ECF 31-3 at 15. He stated: "[T]hat's why we wanted him to go do the training, which I still don't understand—he is such a good doctor—why he just wouldn't go do it, and then he would understand better the difference." *Id.* Although the training "was not mandatory," *id.* at 16, Mr. Cullen "tried to open it up to all treatment team[s]. . . ." *Id.* at 18. He wanted all of the employees to "understand the role of the forensic team and what their responsibilities were." *Id.*

In addition, Cullen stated that "it would have been very good for [plaintiff] to see that so he could understand what everyone was trying to tell him and talk with him about over time." *Id.* at 16. He also testified, *id.*:

> . . . I would say it was in his best interest to go so he could help learn and appreciate and see what both sides were. You know, maybe he could help them better by seeing what the requirements were in Maryland, the law and the Office of Forensic Services. It would have benefited him and us to do that. . . .

According to Cullen, "at no time would Dr. Okusami ever go [to Court] because he was not part of that forensic team, nor did he have the training. So he would never go testify." *Id.* at 9. Nevertheless, he said that Dr. Okusami testified in court when a patient requested his testimony. *Id.* On those occasions, Dr. Okusami was not "working for the state," according to Cullen. *Id.* Rather, "[h]e was at the hearing working on his own or because the patient requested that he be there." *Id.*

As CEO, Cullen attended "many different hearings of all the psychiatrists and psychologists. . . ." ECF 34-2 (Cullen Deposition) at 14, Tr. 47. However, other than for Dr. Okusami, Mr. Cullen had never attended a hearing "at which a psychiatrist was testifying on behalf of the patient's request [sic] or in response to a subpoena." *Id.*, Tr. 48.

14

In October 2016, Cullen attended a hearing at which both Dr. Hendershot and Dr. Okusami testified in order "to see exactly what was going on. . ." *Id.* at 15, Tr. 50.  He understood there to be some "contention" regarding that particular patient.  *Id.*

At the relevant time, Erik Roskes, M.D. served as Director of the Behavioral Health Administration's Office of Forensic Services.  ECF 33-5.[9]  According to Cullen, Dr. Roskes consulted with the forensic team, ECF 37-5 at 8, but he did not supervise Dr. Okusami.  *Id.* at 8-9.  Dr. Hendershot testified that she communicated occasionally with Dr. Roskes in a "limited" way concerning Dr. Okusami.  ECF 31-4 at 16.  Although Dr. Hendershot held her "own opinions" about Dr. Okusami's medical decisions, she did not view it as her "place to judge someone else's practice."  *Id.*

Perkins stated that she "had concerns about the adequacy of [plaintiff's] understanding of the system," based on "[s]everal years of working with him with forensic patients."  ECF 37-4 at 7.  In particular, she had concerns about plaintiff's understanding of forensic concepts with respect to competency and criminal responsibility.  *Id.* at 8. And, she spoke to Dr. Millis and Dr. de Hoyos several times about her concerns.  *Id.* at 8-9.  In response, Dr. Millis asked Dr. Roskes "to meet with all of the psychiatrists to provide education to them about forensic services, the processes, roles within the system."  *Id.* at 9.

At one point, said Perkins, she was "giv[ing] up on any semblance of functioning as a team by the end of [Dr. Okusami's] tenure. . . ."  ECF 31-6 at 8.  In an email to Dr. Roskes, Perkins stated:  "'I only wish we could bring [a] complaint against [plaintiff] for the damage he

---

[9] Dr. Roskes resigned in 2017, after he and several others were found in civil contempt because of the State's failure to provide adequate psychiatric beds at its psychiatric hospitals. ECF 33-5.  However, the contempt findings were reversed on appeal.  *See State v. Crawford*, 239 Md. App. 84, 196 A.3d 1 (2018).

has caused to this facility.'"  *Id.*  She maintained that she was "just . . . venting" when she made

that comment and added, *id.* at 9:

> By the time that Dr. Okusami's tenure came to an end here, there was a great deal of frustration among the forensic team, among the treatment team with his work.  And I speak specifically to his work.  I'm not speaking about him as an individual, but with his work, there was a lot of difficulty in working with him.

Dr. Okusami submitted an email exchange of August 11, 2015, between Ms. Perkins and

Dr. Roskes.  ECF 33-6.  Ms. Perkins emailed Dr. Roskes, indicating that there would be

"competing presentations by Dr. Hendershot and Dr. Okusami" as to the competency of a

particular patient during that patient's guilty plea.  *Id.* at 1. Dr. Roskes responded that Dr.

Okusami should testify first, "as the defense bears the burden to prove NCR.  In this case, i'd

[sic] recommend the state be a stickler on this issue, so that she can aggressively cross examine

him both as to his credentials and as to his opinion.  If I had to bet, and knowing nothing else, he

could not recite the test for insanity in Maryland.  That alone renders him not credible as a

witness." *Id.*

Plaintiff also submitted an email exchange between Dr. Millis and Dr. Roskes on August

13, 2015.  ECF 33-8.  Dr. Roskes stated, in part, *id.*:

> Meanwhile, I think you will need to figure out a way to control this staff member.  He does not get to decide what the scope of his practice at Finan is-you do.  You can certainly advise him that the forensic evaluators contracted to or employed by the Department are the only personnel authorized to testify on behalf of the Department, and we have allocated these resources specifically to protect clinicians from being put into a dual loyalty position.  You can further advise him that if he wishes to become a forensic evaluator who can do this work on behalf of the Department, he will AT MINIMUM need to sign up for and successfully complete the training provided by OFS periodically, and he can then apply for work in this realm.  He also needs to know that completing this training is no guarantee he will be assigned such a role.
>
> Finally, you can advise him, if you like, that his continued intrusion into areas in which he has no expertise is not only embarrassing to the department, and more so to him as he is developing quite a poor reputation in the courts in Western

Maryland, but also is in violation of the Ethics Guidelines from the American Academy of Psychiatry and the Law, which strongly discourages clinicians from taking on forensic roles for patients they are treating. . . .

\*   \*   \*

I really, really need you to rein him in.  If you want me to be the bad cop, that's fine, but we need to put a stop to it as it is completely unacceptable and generally does not happen at any other facility.  He should not be taking on forensic work, any more than I should be doing cardiac surgery.  Surgery is within the scope of my medical license, but it is not something I have been trained to do, and so I, wisely I think, don't do it.

Dr. Millis responded, stating that he would "continue working on this with Dr. Okusami."

*Id.*

Dr. Okusami sent an email to Dr. Roskes on September 24, 2015, titled "Racial

Sensitivity."  ECF 33-9 at 1-2.  He wrote, *id.*:

I bring to your notice for your consideration, the need to be careful that statements you make are not misconstrued as racist. I do not know you to presume anything but whenever I have encountered an inadvertent racial statement I have found it helpful to let the individual know privately rather than a public objection.

At our meeting on Monday, 9/21/15, you told a vignette about a patient who won a jury trial that released him despite your testimony he was still in need of treatment. The story was still instructive without the coloration that I believe inadvertently became racist: when you added that the members of the jury did not look like you but more like the plaintiff and that colored the decision reached. Yuo [sic] then added Baltimore got what it deserved as a result of the verdict.

The added statement is clearly one that indicated that the plaintiff was not white and that the jury's race is same as plaintiff. The racial overtone is easy to conclude. Also Baltimore City is more black.

In the first instance, we run the risk of being condescending if we believe that anyone other than our race can make rational decision and on the other hand the decision of a jury should not be used to determine what the rest of that Jury's race deserve.

The other issue is that you presumed to know me and subjugated my view to cultural difference. This again I see as another example of racial overtone. You know nothing about me or my culture to make such a statement. The statement

also is meaningless considering there is no universal culture in America where I have spent the majority of my adult life.

I hope you take this feedback into consideration so people do not misconstrue your statements as racist and misunderstand you.

In addition, plaintiff submitted an email exchange of October 16, 2015, between Ms. Perkins, Dr. Hendershot, and Dr. Roskes. ECF 33-11. Dr. Roskes stated: "I was in a meeting with Dave Millis today and he said he believes that the 'intervention' a few weeks back was helpful. . . . Do you guys agree?" *Id.* at 1. In response, Dr. Hendershot stated: "I would say we are in a quieter period. As long as we don't disagree, things are quiet but the next difficult case will cause another disagreement. I don't go to administration anymore because it doesn't seem to do any good." *Id.*

In the email, Dr. Hendershot also related an incident involving a patient for whom both she and Dr. Okusami provided an opinion in court concerning the patient's criminal responsibility. *Id.* She indicated that plaintiff's opinion "differed from the Forensic Team." *Id.* According to Dr. Hendershot, plaintiff also testified: "1) anyone who has been diagnosed with a mental illness must be psychotic if/when they attempt suicide; 2) [redacted] was psychotic when he committed his crime, but the trauma of realizing what he had done snapped him back to reality." *Id.* In addition, she stated that plaintiff went to court for another patient and then "drove her to the train station." *Id.* And, she complained that he "no longer attends rounds . . . ." *Id.*

Ms. Perkins stated that Dr. Hendershot had "essentially summed up the recent issues." *Id.* She added that the State prosecutor would "be happy to share the stories" about Dr. Okusami's "presence in court . . . ." *Id.*

18

## C.

Dr. Okusami claims that Cullen "became racist" after Cullen became the CEO of the Center. ECF 31-2 at 37. At his deposition, Dr. Okusami recounted the discriminatory conduct to which he was allegedly subjected, ECF 34-1 at 18, Tr. 62-65:

> [O]ther instances of discrimination existed [when] [Cullen] instructed a nursing supervisor to refuse any order from me regarding use of restraint. My Caucasian colleagues were not subject to such treatment.
>
> When he ordered a social worker to refuse help in finding after-care for a patient I plan on discharge[ing], my Caucasian colleagues were not subjected to that.
>
> When he removed me at the last minute from testifying at a release hearing for a patient—that I already gave testimony for at the first hearing—none of my Caucasian colleagues were ever treated [this] way. . .
>
> Certainly caring about the opinion of less qualified Caucasian colleagues and not asking mine, only suggest to me that he did not value the opinion of this African black.

As noted, plaintiff claims that Cullen was racist because he considered the opinions of Perkins and Dr. Hendershot, yet Cullen "never once asked [plaintiff's] opinion." ECF 31-2 at 43. Plaintiff also stated: "Most reasonable people will not assume that a psychiatrist of my caliber will be less qualified than a social worker or a psychologist just because they happen to have worked longer at Finan." *Id.* at 43-44. Yet, Mr. Cullen "did not bother" to seek plaintiff's medical opinions, and "accepted" the opinions of his less qualified white colleagues. *Id.* at 37.

For example, in September 2016, Mr. Cullen "stopped [plaintiff's] discharge of a patient and transferred the patient to [his] Caucasian colleague," Dr. Sherri Passarell, who was "less qualified than [he] was . . . ." ECF 31-2 at 90-91; ECF 33-12 (Plaintiff's Affidavit) at 2.[10] Dr.

---

[10] Plaintiff uses the spelling "Passarel." *See*, *e.g.*, ECF 33-12; ECF 31-2 at 40. According to the doctor, her surname is spelled "Passarell." *See* ECF 33-4 at 2 (signature of the doctor). I shall use Dr. Passarell's spelling.

Okusami complains that Mr. Cullen never asked for his opinion on the matter, nor did Cullen discuss the matter with him or explain his reason for the decision.  ECF 33 at 12.  Claiming the decision was racially motivated, plaintiff testified, ECF 31-2 at 91:  "It goes with the pattern of being disrespected for my opinion.  If it was not racial, why did he not ask my opinion, why I thought the patient was ready for discharge?"  Further, plaintiff averred, ECF 33-12 at 2: "None of the other white psychiatrists on staff at Cottage 1 where I worked were subjected to such treatment during their course of provision of medical care to their patients."  He also testified that he did not know Mr. Cullen planned to transfer the patient to another psychiatrist until Dr. Passarell "announced she was taking over the patient's care."  ECF 34-1 at 19, Tr. 67.

Dr. Okusami also testified that Cullen was "racist" because he called plaintiff to his office "for unjustified reasons," telling him of staff members' complaints, yet he "never showed" the complaints to plaintiff.  ECF 31-2 at 37.  In addition, Dr. Okusami complains that Cullen told him his "job was on the line" if he continued to testify for his patients.  *Id.* at 53.  And, plaintiff complains that Cullen told him that "people downtown wanted him to get rid" of plaintiff and "other people had complaints about [plaintiff] but he refused to show" plaintiff the particular complaints.  *Id.*

Moreover, plaintiff claims that, in contrast to his white colleagues, he was "subjected to criticism for [his] care of patients."  ECF 31-2 at 90.  For example, in January 2016 a patient was transferred to plaintiff from Dr. Passarell, a Caucasian female.  ECF 33-12 at 1.  Plaintiff avers that Dr. Passarell and Dr. Hendershot misdiagnosed the patient as psychotic when he was actually a malinger.  *Id.*  But, at the patient's release hearing, Cullen substituted Dr. Millis to testify, in lieu of plaintiff.  *Id.*  And, Dr. Passarell was "never subjected to negative public review, comment, or criticism for exhibiting poor clinical judgment."  *Id.* at 2.

Dr. Okusami avers that in April 2016, a patient was "forcibly transferred" from his care to Dr. Passarell because he refused to prescribe more medication, which was not medically justified, in his view. *Id.*; *see also* ECF 31-2 at 37.  According to plaintiff, the patient died a few months later, after excess medication was provided, yet Dr. Passarell was not criticized for her "poor clinical judgment . . . ."  ECF 33-12 at 2; *see also* ECF 31-2 at 36-38.

In addition, plaintiff stated that there were other occasions when he was treated differently from his Caucasian colleagues.  To illustrate, plaintiff said a nursing supervisor was once instructed to refuse his orders "regarding use of restraint."  ECF 31-2 at 55; *see* ECF 34-1 at 18, Tr. 65.  Dr. Okusami also maintained that Cullen "ordered a social worker to refuse help in finding after-care for a patient" who Dr. Okusami wanted to discharge.  ECF 31-2 at 55.

According to plaintiff, in September 2016 a patient called him as his treating psychiatrist to testify at his release hearing.  ECF 33-12 at 2.  However, Dr. Hendershot and Ms. Perkins asked plaintiff not to testify because the patient "had not 'stayed long enough' in the hospital." *Id.*  He maintains that no white psychiatrists were subjected to this type of conduct.  *Id.*

Plaintiff also alleges that he was subjected to race discrimination twice in 2015, when he was not paid for court testimony that he provided pursuant to subpoenas from patients.  Yet, his Caucasian colleagues who were called to testify were paid.  ECF 33-12 at 1; *see also* ECF 31-2 at 37, 54-55.  And, Cullen "removed [plaintiff] at the last minute from testifying at a release hearing for a patient" for whom plaintiff had previously testified.  ECF 31-2 at 54-55.

The first incident of court testimony for which Dr. Okusami was not paid took place in March or August of 2015.  *Id.* at 62, 64.  Dr. Okusami claimed that he was subpoenaed by the patient's attorney to give his opinion, "which was the patient's right."  *Id.* at 63.  He added: "If the court did not feel my opinion was required I would not have been accepted as an expert in

21

psychiatry." *Id.* Dr. Okusami offered his opinion that the person was not criminally responsible, because he was psychotic. *Id.* at 64. He explained, *id.* at 65:

> I don't know that there was a departmental opinion, but [Dr. Hendershot] certainly was representing the hospital. I was also representing the hospital, because I provided care to the patient in the hospital. I just had a different opinion.

> One should not be punished for difference in opinion especially since I was daily responsible for the patient.

> Dr. Hendershot was not even a member of my unit. Yes, I believe my opinion was more medically sound than someone who only marginally interacted with the patient.

> On that occasion, Dr. Okusami filled out a "time sheet." *Id.* at 57. However, Mr. Cullen

told him that he "was not performing hospital duty." *Id.*; *see also id.* at 58. Dr. Okusami

contends that this was "ridiculous" because he was "subpoenaed in the course of . . . providing

care to a hospital patient." *Id.* at 57.

Plaintiff also was not paid for court testimony in October 2015 at a competency hearing.

*Id.* at 62, 72. Dr. Okusami stated, *id.* at 73:

> The patient was under my care. I found that she had no psychiatric illness for which she was incompetent. Her attorney also got an independent psychologist who came to the same conclusion. The department was forced to do an evaluation by its then chief psychologist, who also concluded [the] patient was competent. This patient had refused to be seen by [Hendershot] and Perkins after the first meeting with them, and they told [her] she was incompetent because a psychologist from jail said. She accused them of not evaluating her independently.

Dr. Okusami agreed that he had offered his opinion "as to the ultimate issue of whether

this person was competent or incompetent to stand trial." *Id.* He said, *id.* at 73-74:

> If I am supposed to treat a patient for mental illness and my evaluation showed she had no mental illness, of course my opinion was that she understood her legal situation, that she has a right to a lawyer and assist in her defense. Understood what it meant to have a trial and make a plea.

Of course those are important elements of being competent.  By the way, this patient already had a trial and was found guilty and sentenced to 90 days in jail.  It was because she appealed her conviction that her lawyer raised the issue of her being incompetent.  She was furious and rightly so.  She said, "If I was incompetent, why did the judge allow me to make a plea?"

Dr. Okusami testified that he was "aware that patients who plead NCR are ordered by court for evaluation."  ECF 31-2 at 61.  Typically, Dr. Hendershot would evaluate the patient, but Dr. Okusami's signature would be included with her forensic report.  *Id.* at 62.  Plaintiff was asked to explain the standard or test for criminal responsibility in Maryland.  He responded, *id.* at 66-67:

My evaluation in total takes the history of the patient's illness and especially the mental state of the patient at the time.  I don't know that there is any standard test for determining criminal responsibility.  It is a comprehensive psychiatric evaluation of the patient and that allows to determine whether the mental illness was at play whether the crime was committed.

In addition, plaintiff was asked if he was aware of case law concerning "the standard and accepted tests for criminal responsibility in the state of Maryland."  *Id.* at 67.  He replied: "[M]y testimony was accepted by the Court as an expert in psychiatry not forensic."  *Id.*  Plaintiff added, *id.* at 68: ". . . I did not testify as a forensic expert, so my evaluation and treatment allows me to opine that the patient was not criminally responsible.  It is after all up to the judge to weigh the testimonies."

Dr. Okusami was presented with the ethics guidelines from the American Academy of Psychiatry In The Law.  *Id.* at 68-69.  It states, in part, *id.* at 69:

Psychiatrists who take on a forensic role for patients they are treating may adversely affect the therapeutic relationship with them.  Forensic evaluations usually require intervening corroborative sources exposing information to public scrutiny or subjecting evaluees and the treatment itself to potentially damaging cross-examination.  The forensic evaluation and the credibility of the practitioner may also be undermined by conflicts inherent in the differing clinical and forensic roles.  Treating psychiatrists should therefore generally avoid acting as an expert

23

witness for their patients or performing evaluations of their patients for legal purposes.

Although Dr. Okusami "[p]artly" agreed with the statement, *id.*, he maintained that he was "legally bound" to provide testimony if subpoenaed. *Id.* at 70. He added, *id.*: "If I am asked a question as to whether the patient was criminally insane, I have a responsibility to give my honest opinion. Ethics or guidelines [are] not binding." *Id.* He continued, *id.*: "I also have a duty to do no harm to any patient. So refusing to give my opinion will harm the patient and subject me to the Board of Licensing inquiry if the patient files a complaint."

Moreover, Dr. Okusami rejected any contention that he was not qualified to offer his opinion on forensic issues, insisting that he was qualified as a psychiatrist "to offer an opinion on any patient under [his] care." *Id.* He noted that he did not present himself as a forensic expert, *id.* at 71, but explained, *id.*: "I was asked my opinion in court and gave it. Where does it say psychiatrists are not allowed to give opinions on forensic cases? In the end the judges decide what opinion matters most."

At a meeting with psychiatrists at an unspecified date, Dr. Okusami was "surprised" to see Cullen in attendance. *Id.* at 81. Cullen was "worried about [plaintiff's] plan to testify for a patient." *Id.* Cullen told Dr. Okusami that he was "tired of [him] testifying for patients, and that [his] job was on the line." *Id.* Plaintiff responded that his testimony was "not any different from when [he] testified when the hospital wanted [him] to" and that his goal was "simply testifying about patients' treatment and their state of current wellbeing." *Id.* He continued: "Mr. Cullen never asked what my medical opinion was. I told him that threatening me was not helpful as patients who demand a hearing for release under the law are entitled to call their doctor if they so choose." *Id.* Dr. Okusami testified as planned for the patient, and then took a "week of already

planned vacation." *Id.* at 82.  When he returned, Mr. Cullen called plaintiff to his office and then terminated his employment.  *Id.*

Plaintiff claimed that he had attended some forensic meetings, but was not aware of a meeting in which Mr. Cullen had made similar comments to colleagues, or criticized them in front of others.  *Id.* at 86.  In his view, he was "subject to criticism in the senior staff meeting and no other colleagues were so treated."  *Id.*  He added, *id.*:  "Even when the patient died as a result of treatment received from my Caucasian colleagues, there was no criticism by Cullen or at any staff meeting."

Significantly, plaintiff was asked if Mr. Cullen had mentioned race or made any derogatory comments.  *Id.* at 83.  Dr. Okusami replied: "*This has nothing to do with race*.  It was simply an intimidation to force me to not testify.  On the many occasions I testified for the hospital, there was never a problem."  *Id.* (emphasis added).  He added that he believed his "contract was terminated for having a different view from the forensic [team]."  *Id.* at 84. Further, he stated: "I also believe that Mr. Cullen attempted to force me to violate my fiduciary duty to my patient, and when I refused, he retaliated by terminating my contract."  *Id.*

Dr. Okusami was asked: "Do you have any belief that the termination of your contract was based on your race?  And if so, what is the basis of your belief?"  *Id.* at 86-87.  The following response is relevant, *id.* at 88-89 (emphasis added):

> *No, my termination was not due to racism*.  Mr. Cullen simply abused his power. You see Mr. Cullen already threatened me in late 2015 when he told me people wanted him to get rid of me.
>
> At that time, I educated myself on at-will employment provisions.  I found out Maryland State Legislature endorsed some exception to the provision, namely when used as retaliation, public policy interest and implied continuing employment.

Mr. Cullen terminated my employment as retaliation for refusing to abandon my fiduciary duty when I testified for the patient.

His intimidation of me as a witness is certainly, in my lay opinion, witness tampering and against public policy.

Mr. Cullen already stated that my contract would have been renewed, which proves my point.  I was promised continued employment if I did not lose my license or convicted.

Certainly I was racially discriminated against by Mr. Cullen and others, but termination was not racially [sic].  It was simply an abuse of power.

Dr. Okusami submitted two performance reviews from 2015.   The first was completed by Dr. Passarell, a staff psychiatrist, in April 2015.  ECF 33-4 at 3.  She rated him "good" or "very good" with respect to medical and clinical skills, technical skills, clinical judgment, interpersonal skills, communication skills, and professionalism.  *Id.* at 1.  In Dr. Passarell's view, plaintiff was "[e]asy to work with, brings a different point of view to our group discussions allowing us to examine pt. issues from multi-faceted points of view."  *Id.* at 2.  The second performance evaluation was completed in April 2015 by Dr. de Hoyos.  *Id.* at 4.  She rated plaintiff as "excellent" on most skills.

In addition, plaintiff submitted the "American Academy Of Psychiatry And The Law Ethics Guidelines for the Practice of Forensic Psychiatry."  ECF 33-3.  Section IV is titled "**Honesty and Striving for Objectivity**."  *Id.* at 3.  In "Commentary" it states, in part, *id.* at 4 (emphasis added):

The adversarial nature of most legal processes presents special hazards for the practice of forensic psychiatry.  Being retained by one side in a civil or criminal matter exposes psychiatrists to the potential for unintended bias and the danger of distortion of their opinion.  It is the responsibility of psychiatrists to minimize such hazards by acting in an honest manner and striving to reach an objective opinion.

Psychiatrists practicing in a forensic role enhance the honesty and objectivity of their work by basing their forensic opinions, forensic reports and forensic

testimony on all available data. They communicate the honesty of their work, efforts to attain objectivity, and the soundness of their clinical opinion, by distinguishing, to the extent possible, between verified and unverified information as well as among clinical "facts," "inferences," and "impressions."

*   *   *

Psychiatrists who take on a forensic role for patients they are treating may adversely affect the therapeutic relationship with them. Forensic evaluations usually require interviewing corroborative sources, exposing information to public scrutiny, or subjecting evaluees and their treatment itself to potentially damaging cross-examination. *The forensic evaluation and the credibility of the practitioner may also be undermined by conflicts inherent in the differing clinical and forensic roles. Treating psychiatrists should therefore generally avoid acting as an expert witness for their patients or performing evaluations of their patients for legal purposes.*

Treating psychiatrists appearing as "fact" witnesses should be sensitive to the unnecessary disclosure of private information or the possible misinterpretation of testimony as "expert" opinion. In situations where the dual role is required or unavoidable (such as Workers' Compensation, disability evaluations, civil commitment, or guardianship hearings), sensitivity to differences between clinical and legal obligations remains important.

When requirements or geography or related constraints dictate the conduct of a forensic evaluation by the treating psychiatrist, the dual role may also be unavoidable; otherwise, referral to another evaluator is preferable.

Additional facts are included, *infra.*

## II. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557,

585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hogslat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light

most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

## III.  Discussion

### A.

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1); *see Bostock v. Clayton County, Ga.*, ___ U.S. ___, 140 S. Ct. 1731, 1738 (2020); *Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir.

2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). The Supreme Court has referred to discrimination based on one of these five characteristics as "status based discrimination." *University of Texas SW. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013). And, "[t]his provision is sometimes referred to as the 'anti-discrimination' provision." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019).

Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3; *see*, *e.g.*, *Perkins*, 936 F.3d at 213. The purpose of Title VII's antiretaliation provision is to maintain "unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). In addition, Title VII prohibits "the creation or perpetuation of a discriminatory work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 426 (2013).

In general, Title VII requires intentional discrimination. *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019). But, "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci*, 557 U.S. at 577.

"'Disparate treatment occurs when an employer treats certain people less favorably than others on the basis of a protected classification such as race.'" *Perkins*, 936 F.3d at 207 (citation omitted). In a disparate treatment case, the plaintiff must establish "'that the defendant had a

discriminatory intent or motive' for taking a job related action." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000) ("The ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination."). In other words, "[l]iability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'" *Raytheon Co.*, 540 U.S. at 52.

In general, *at trial* a plaintiff "may establish a discrimination claim under Title VII through two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). A Title VII plaintiff may show intentional discrimination through direct or circumstantial evidence. *Spencer*, 919 F.3d at 207. Alternatively, the plaintiff may use the burden – shifting framework established in *McDonnell Douglas Corp. v.* Green, 411 U.S. 792 (1973).

Reference to the avenues of proof serves to inform a court's evaluation of a motion for summary judgment. *Cf. Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young*, 575 U.S. at 228-29 (construing

the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). *See Reeves*, 530 U.S. at 142; *Westmoreland TWC Admin. LLC,* 924 F.3d 78, 726 (4th Cir. 2019).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves*, 530 U.S. at 142; *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant

carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255.  In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture."  *St. Mary's Honor Ctr.*, 509 U.S. at 510-11.  The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations."  *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978).  And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law."  *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established.  *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*.  *See Burns*, 96 F.3d at 731.  At the summary judgment stage, however, these approaches merely serve to inform a court's evaluation of the allegations.  *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019); *Pettis*, 592 F. App'x at 160 (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

**B.**

To establish a prima facie claim of discrimination under *McDonnell Douglas*, the plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."  *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citation omitted), *aff'd*, 566 U.S. 30 (2012); *see Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019); *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015); *see also Wilcox v. Lyons*, ___ F.3d ___, 2020 WL 4664794, at *3 (4th Cir. Aug. 11, 2020) (setting forth elements of a Title VII retaliation claim).

As discussed in more detail, *infra*, an "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).  Dr. Okusami's termination on October 17, 2016, readily constitutes an adverse employment action.  And, as a person of color, plaintiff is a member of a protected class.

34

Before a plaintiff files suit under Title VII, the plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Md. Dep't of Transp.*, 662 F. App'x 221, 224 (4th Cir. 2016). To do so, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004). However, this period is extended to 300 days in a deferral state, such as Maryland. *See Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4, n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F, App'x 256 (4th Cir. 2008). Thus, plaintiff had to file a charge of discrimination with the EEOC or the Maryland Commission on Civil Rights within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000(e)-5(e)(1)); *see Perkins*, 936 F.3d at 207; *Gilbert v. Freshbikes, LLC,* 32 F. Supp. 3d 594, 605 (D. Md. 2014).

Exhaustion under Title VII is not jurisdictional. *See Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846, 1850 (2019). Rather, it is a "claim-processing rule[] that must be timely raised to come into play." *Id.* at 1846. And, Title VII's limitations period is subject to equitable tolling. *See Irwin v. Dep't of Veterans Affairs*, 498, U.S. 89, 95-96 (1990). But, "a court must enforce the rule" if it is "properly" raised. *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam); *see Stewart v. Iancu*, 912 F.3d 693, 701-02 (4th Cir. 2019).

Because a court may only consider Title VII claims that fall within the applicable limitations period, I begin with the issue of administrative exhaustion. *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 139 (4th Cir. 2007).

As noted, plaintiff was not paid for his court testimony on two occasions in 2015.  He was terminated on October 17, 2016.  He filed his charge with the EEOC on December 30, 2016.  ECF 33-14.  Applying the 300 days, defendant maintains that "any adverse employment action that occurred on or before March 5, 2016 is now time-barred for any potential discrimination claims being asserted by Dr. Okusami."  ECF 31-1 at 15.  Thus, according to defendant, the claims are time barred to the extent they are based on the two instances in 2015 when Dr. Okusami was denied payment for his court testimony.  *Id.* (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)) (concluding that "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges.").  And, defendant posits that the remaining occurrences, aside from Dr. Okusami's termination, do not rise to the level of adverse employment actions.  ECF 31-1 at 16.

Plaintiff posits that the failure to pay him for his court appearances is relevant for context.  ECF 33-1 at 18-19.  He argues that incidents, events, and conduct prior to March 5, 2016, "serve as background evidence supportive of Plaintiff's claims of Mr. Cullen's acting in a discriminatory fashion."  *Id.*

Further, Dr. Okusami asserts that he filed charges about "related discrete acts" that occurred after March 5, 2016, "including but not limited to Mr. Cullen's ordering a social worker (in the last week of September 2016). . . to refuse help in finding after-care treatment for a patient Dr. Okusami planned to discharge when his Caucasian colleagues were not subjected to such treatment, Mr. Cullen's discriminatory and intimidating appearance at Plaintiff's hearing on October 7, 2016 (see Complaint at para. 19) and Plaintiff's termination in November 2016."  *Id.*  In his view, these discrete acts establish a "viable claim" of racial discrimination.  *Id.*

Moreover, plaintiff suggests that defendant construes "adverse employment action" too narrowly. *Id.* at 20. He insists that Mr. Cullen's "actions constituted significant changes in Plaintiff's employment with respect to reassignment with significantly different responsibilities, a significantly different level of responsibility, and a practice that deprives an individual of employment opportunities." *Id.* He adds that the "tenets" of his work changed significantly as a result of the discriminatory acts, which amounts to adverse employment action. *Id.* at 21.

The Fourth Circuit has admonished that the exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, administrative exhaustion advances the complementary goals "of protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart*, 912 F.3d at 699 (internal quotation marks and alterations omitted); *see also Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 406-07 (4th Cir. 2013).

"Any discrete acts of discrimination that occurred prior to the applicable period are procedurally barred and cannot be used as a basis for recovery." *Gilliam*, 474 F.3d at 139. This includes discrete acts that are related to acts alleged in timely filed charges. *Id.* But, under the continuing violation doctrine, a Title VII plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as another act fell within the limitations period and the acts are part of an ongoing pattern of discrimination. *Id.* at 140; *see also Guessous*, 828 F.3d at 222; *Agolli v. Office Depot, Inc.*, 548 F. App'x 871, 874-75 (4th Cir. 2013).

As to Title VII, the Supreme Court clarified the applicability of the continuing violation doctrine in the case of *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In *Morgan*, the plaintiff sued Amtrak under Title VII, alleging that he had been subjected to various

discrete discriminatory and retaliatory acts, and had experienced a racially hostile work environment throughout his employment. *Id.* at 104.

Prior to filing suit, the plaintiff filed a charge with the EEOC, alleging that he was "'consistently harassed and disciplined more harshly than other employees on account of his race.'" *Id.* at 105. However, many of the alleged discriminatory events of which the plaintiff complained took place outside of Title VII's requisite time period for filing a charge with the EEOC. *Id.* at 106. As a result, Amtrak moved for summary judgment as to all of the events that took place outside of the filing period. The district court granted the motion. *Id.*

The Ninth Circuit reversed, applying the continuing violation doctrine. *Id.* at 106-07. That court determined that a plaintiff may sue on claims that were filed with the EEOC outside of the period established by Title VII if the claims were part of a series of related acts; some of the acts took place within the limitations period; and the plaintiff shows that there is a systematic policy or practice of discrimination, part of which operated within the limitations period. *Id.* at 107. The Ninth Circuit concluded that each of plaintiff's three Title VII claims (*i.e.*, discrimination, hostile work environment, and retaliation) was sufficiently related to the post-limitations conduct to establish a continuing violation. *Id.* at 107-08.

The Supreme Court reversed the Ninth Circuit, in part. With respect to the plaintiff's claims for discrete discriminatory and retaliatory acts, the Court stated that a party "must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." *Id.* at 110. The Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. And, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* The Court went on to define actions that qualify as discrete, stating, *id.* at 114:

Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

However, the *Morgan* Court affirmed the Ninth Circuit as to plaintiff's claim for hostile work environment. *Id.* at 115. The Court observed that, unlike discrete acts, hostile work environment claims occur "over a series of days or perhaps years . . . ." *Id.* And, the Court observed that, with respect to hostile work environment claims, "a single act of harassment may not be actionable on its own." *Id.* Thus, as to hostile work environment claims, the Supreme Court concluded, *id.* at 117: "It does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period." The Court continued, *id.*: "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."

The claim of race discrimination remains pending. As indicated, on two occasions in 2015, plaintiff was denied payment for his court appearances. The occurrences were discrete acts that took place before March 5, 2016. Although plaintiff points to these occurrences as background, they are not independently actionable.

Therefore, the discrete actions under consideration as to plaintiff's race discrimination claim are the incidents in which Cullen and others changed the treatment plans for Dr. Okusami's patients; Cullen's failure to seek plaintiff's medical opinions; Cullen's presence in court when Dr. Okusami testified; and Dr. Okusami's termination. *See* ECF 33-1 at 19. Apart from the termination, a key question here is whether any of the other conduct constitutes an adverse employment action.

### C.

As discussed, an adverse employment action "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle,* 650 F.3d at 337 (quoting *Burlington Indus., Inc.*, 524 U.S. at 761). The action must "'adversely affect[] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *Booz-Allen & Hamilton, Inc.*, 368 F.3d at 375); *see Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999) ("[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.").

There is no evidence that the change in treatment directives as to plaintiff and his patients constituted a reassignment with different job responsibilities, nor was there any change in plaintiff's benefits. Similarly, there is no evidence to show any significant change in status as a result of Mr. Cullen's presence when plaintiff testified as a witness. Nor does Cullen's alleged conduct in ignoring plaintiff's medical opinions amount to an adverse action.

"Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 32 (D. Md. 2003). Notably, "[a]n action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of [his] employment, is not an adverse employment action." *Spriggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002); *see Boone*, 178 F. 3d at 255-56.

In contrast, as indicated, Dr. Okusami's termination clearly qualifies as an adverse action. *See Burlington,* 524 U.S. at 761 ("A tangible employment action constitutes a significant change

in employment status, such as . . . firing . . . .").  This determination does not end the inquiry, however.

As noted, the elements of a claim of race discrimination are as follows: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190 (citation omitted), *aff'd*, 566 U.S. 30 (2012).  And, to succeed, plaintiff must show that the Center had a discriminatory motive in terminating his employment.  *Raytheon Co.*, 540 U.S. at 52 ("Liability in a disparate-treatment case depends on whether the protected trait. . . actually motivated the employer's decision.") (quotation omitted).

The evidence clearly shows that plaintiff is a member of a protected class and he suffered an adverse employment action, *i.e.*, termination.  As to the second factor, satisfactory job performance, Dr. Okusami submitted two positive performance reviews from 2015.  *See* ECF 33-4.  But, the evidence suggests that there was considerable dissatisfaction at the Center with plaintiff's unwillingness to undergo forensic training and with plaintiff's belief that it was appropriate for him, as a treating physician, to appear in court as a witness for his patients as to forensic issues.  *See*, *e.g.*, ECF 33-8; ECF 33-11.

Construing the record in the light most favorable to plaintiff as the nonmoving party, there is a dispute of material fact as to whether Dr. Okusami's job performance was satisfactory.  At the time of termination, however, the Center did not suggest that Dr. Okusami was being terminated for cause.

Plaintiff was an at-will employee of the State.  In Maryland, at-will employment ordinarily "can be terminated at the pleasure of either party at any time."  *Hrehorovich v. Harbor Hospital Center, Inc.*, 93 Md. App. 772, 790, 614 A.2d 1021, 1030 (1992).  And, S.P.P. § 11-

305(b), covering State employees, provides that an at-will employee "serves at the pleasure" of the "appointing authority" and that the employee "may be terminated . . . for any reason that is not illegal or unconstitutional, solely in the discretion of the appointing authority."

Therefore, the Department was entitled, in its discretion, to terminate plaintiff for any reason, or no reason, so long as the discharge was not for an illegal reason, such as race discrimination.   In other words, the Center could not terminate plaintiff if it did so in contravention of a clear mandate of public policy.   And, race discrimination violates public policy.  *See*, *e.g.*, *Molesworth v. Brandon*, 341 Md. 621, 629, 672 A.2d 608, 612 (1996); *Adler v. American Standard Corp.*, 291 Md. 31, 4312 A.2d 464 (1981); *see also Andrew v. Clark*, 561 F.3d 261, 269 (4th Cir. 2009); *Higginbotham v. Pub. Serv. Comm'n*, 171 Md. App. 254, 267, 909 A.2d 1087, 1094 (2006).   However, if the Department was dissatisfied with plaintiff's job performance, for whatever reason, or if it otherwise decided it simply did not want to retain plaintiff as an employee, it was entitled to terminate him, so long as it did not do so for an impermissible, illegal reason, such as race discrimination.[11]

Plaintiff's claim fails because there is no evidence of race discrimination or disparate treatment.  His reliance on disparate treatment fails because, among other things, plaintiff has not provided suitable comparators.   And, perhaps most significant, he has conceded that his termination was not racially motivated, and that is the only conduct that constitutes an adverse employment action.

As shown, Dr. Okusami contends he was treated differently based on his race, and he

---

[11]   Coincidentally, in an editorial in THE BALTIMORE SUN on September 3, 2020, involving the recent termination of an at-will public employee by the Governor of Maryland, the newspaper explained "'at-will' jobs" in lay terms, stating:   "Unless a firing represents an especially blatant violation of employment law (because of race or gender or for blowing a whistle on wrongdoing for example) [employers] have the authority to send you packing simply because they think someone else could do the job better."  *Id.*

specifically identified two Caucasian employees as comparators:  Mary Lou Perkins, a social worker, and Janet Hendershot, a psychologist.  Where a plaintiff asserts a disparate treatment claim, the plaintiff must demonstrate that a comparator is similarly situated in all relevant respects.  *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017).  This includes "that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *see Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014).

Of course, the comparison "'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances.'" *Haynes*, 922 F.3d at 223-24 (citation omitted); *see Irani v. Palmetto Health*, 767 F. App'x 399, 420 (4th Cir. 2019) (per curiam).  But, conclusory assertions are insufficient.  *See Swaso*, 698 F. App'x at 748; *cf. Sanchez v. Whole Foods Mkt.*, No. 18-cv-3106-GJH, 2019 WL 3717771, at *4 (D. Md. Aug. 5, 2019); *Bowen v. Md. Dept. of Pub. Safety and Corr. Servs.*, No. 17-cv-1571-RDB, 2018 WL 1784463, at *10 (D. Md. Apr. 12, 2018).

Plaintiff argues that there are sufficient similarities between himself, Dr. Hendershot, and Ms. Perkins for them to serve as appropriate comparators.  ECF 33-1 at 27.  He maintains that the fact that Dr. Okusami "was employed pursuant to a Personal Services Contract and the comparators were full-time state employees is not dispositive of the issue. . ." *Id.*  And, he notes that all three were supervised by Mr. Cullen in 2016.  *Id.* at 27-28.  Moreover, he contends that the three had overlapping job descriptions.  *Id.* at 28.

To be sure, Title VII only requires the compared jobs to be "'similar' rather than 'equal' . . ." and "there is no bright-line rule for what makes two jobs 'similar' under Title VII . . . ." *Spencer*, 919 F.3d at 207. But, courts consider, *inter alia*, whether the employees had the same job description, "'were subordinate to the same supervisor,'" and "had comparable experience, education, and other qualifications . . . ." *Id.* (citation omitted).

Dr. Okusami was a contract employee, and therefore bound by his contract's at-will employment clause (ECF 31-1 at 23), while his selected comparators are State employees who were subject to S.P.P. §§ 11-101 *et seq. Id.* at 22-23. Moreover, the comparators occupy different fields, with different responsibilities. Dr. Okusami is a psychiatrist with board certification; Dr. Hendershot is a psychologist; and Ms. Perkins is a social worker. *Id.* at 21. Indeed, plaintiff repeatedly characterized both colleagues as "less qualified" than he. ECF 33-1 at 20-21. Significantly, they did not share a supervisor. Dr. Okusami was supervised by Dr. Millis until July 8, 2016. ECF 31-2 at 46. Then, he was administratively supervised by Cullen. According to plaintiff, Dr. Hendershot and Ms. Perkins were supervised by "'the heads of their different departments.'" *Id.* at 22. Thus, Dr. Okusami was not similarly situated to his selected comparators in all respects. ECF 31-1 at 22.

Moreover, Perkins and Hendershot are inappropriate comparators because there is "no evidence in the record to show that Ms. Perkins or Dr. Hendershot ever had a different view from the forensic team, thus depriving Mr. Cullen of an opportunity to treat them differently." *Id.* at 24-25. Even assuming that the positions of Perkins and Hendershot were sufficiently comparable, there is no evidence to compare the conduct leading to Dr. Okusami's termination with any conduct of Dr. Hendershot or Ms. Perkins.

Put another way, neither Hendershot nor Perkins engaged in comparable conduct with disparate consequences. *See Haywood*, 387 F. App'x at 359. Dr. Okusami testified that his termination was due to his disagreements with the forensic team; there is no evidence in the record that Hendershot or Perkins had a disagreement with the forensic team.

Perhaps most significant, Dr. Okusami admitted that his termination was not motivated by race. ECF 31-1 at 16. At his deposition, plaintiff was specifically asked whether his termination was racially motivated. Dr. Okusami's testimony was unequivocal. Candidly, he stated: "No, my termination was not due to racism. Mr. Cullen simply abused his power." ECF 31-2 at 87. He also said: "Mr. Cullen terminated my employment as retaliation for refusing to abandon my fiduciary duty when I testified for the patient." *Id.* And, he stated: "Certainly I was racially discriminated against by Mr. Cullen and others. My termination was not racially [sic]. It was simply abuse of power." *Id.* at 88.

Plaintiff contends that these admissions are not fatal to his claim because race does not need to be the sole motivating factor. ECF 33-1 at 22. He argues that he was terminated for having a different view from the forensic team, which consisted entirely of Caucasians. *Id.* But, the record is simply devoid of any evidence that Dr. Okusami's termination was racially motivated.

Even assuming that plaintiff's assertions amount to a prima facie claim of discrimination, the defendant has provided a legitimate, non-discriminatory reason for his termination; defendant was an at-will employee and therefore he could be terminated without cause. And, there is no evidence that the defendant's proffered reason was a pretext for discrimination. *See Adams v. Trustees of Univ. of No. Carolina*, 640 F.3d 550, 560 (4th Cir. 2011).

Plaintiff may well have been a superb doctor.  But, because plaintiff was an at will employee, the Department was entitled to terminate him for any reason or no reason, so long as it was not for an illegal reason.

### IV.  Conclusion

For the reasons stated above, I shall grant the Motion (ECF 31).  An Order follows, consistent with this Memorandum Opinion.


Date:   September 11, 2020                         _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge

46